**UNITED STATES of America**

v.

**John P. MOSCONY, Appellant.**

**No. 90–1535.**

United States Court of Appeals,
Third Circuit.

Submitted under Third Circuit Rule 12(6)
Jan. 15, 1991.

Decided March 8, 1991.

---

Ronald F. Kidd, Mark B. Sheppard, Duane, Morris & Heckscher, Philadelphia, Pa., for appellant.

Michael J. Rotko, Acting U.S. Atty., Walter S. Batty, Jr., Asst. U.S. Atty., Chief of Appeals, Paul J. Van de Graaf, Asst. U.S. Atty., Philadelphia, Pa., for appellee.

Before STAPLETON, GREENBERG, and WEIS, Circuit Judges.

## OPINION OF THE COURT

GREENBERG, Circuit Judge.

### I. PROCEDURAL AND FACTUAL BACKGROUND

This case is before the court on appeal by John P. Moscony from numerous convictions for offenses which he committed in the operation of his real estate business, arising from home mortgage insurance programs of the United States Department of Housing and Urban Development/Federal Housing Administration. Under these programs, *see* 24 C.F.R. § 203 *et seq.*, § 221 *et seq.*, there are, *inter alia*, three requirements: (1) the buyer must, in essence, put down at least 3% cash toward the cost of acquisition (the "minimum borrower investment"), 24 C.F.R. §§ 203.19(a)(1), 221.50(a); (2) the buyer must use the home as a residence to qualify for a 97% loan-to-value mortgage, 24 C.F.R. §§ 203.18(c), 221.20(a); and (3) the buyer must have an income sufficient to make the mortgage reasonably sound to insure, 24 C.F.R. §§ 203.33, 221.60(e). Information regarding the buyer's compliance with these requirements, and other buyer-related information, is in part received by the FHA on mortgage applications, so-called "FHA 2900's," which bear this warning:

Federal Statutes provide severe penalties for any fraud, intentional misrepresentation, or criminal connivance or conspiracy purposed to influence the issuance of any guarantee or insurance by ... the HUD, FHA Commissioner.

Buyer information and the particulars of the proposed transaction is also garnered through the purchase agreement—which, *inter alia,* discloses the names of the parties and the purchase price—, and through real estate broker "escrow letters" in which the broker sets forth the amount of cash that the buyer has on deposit with the real estate agency to use as a down payment.

Under the FHA mortgage insurance program as applied to the transactions relevant to this case, after a mortgage application was approved on the basis of the buyer/borrower information contained in the FHA 2900, the purchase agreement, the escrow letter, and any additional papers, the FHA agreed to insure the mortgage. The mortgage, in turn, was taken by an independent mortgage company for the loan to the buyer, and the loan check was written out to the abstract company from the mortgage company's account in either New Jersey or Texas. The abstract company would then deposit the loan check in its account in Pennsylvania and, acting as settlement agent at closing, would write all the necessary checks from its settlement account. The seller received the balance of the loan proceeds after the claims of all interested parties were paid, and the settlement agent then filled out and sent to the FHA a settlement sheet showing the final particulars of the transaction—including the payments made at closing, and how much cash the buyer actually brought to the closing. Starting in 1984, under a so-called "direct endorsement" program, the initial decision to guarantee a mortgage based on all of the information submitted was delegated by the FHA to the mortgage companies, with the FHA retaining ultimate authority and responsibility over the guarantee.

Appellant John P. Moscony—real estate broker, real estate speculator, and homeowners' insurance salesman—came under investigation when it was noticed that he had been involved in a large number of FHA-backed real estate transactions in which the buyers defaulted on the mortgages. After a lengthy grand jury investigation, in June of 1988, Moscony, and his chief salesman, partner, and co-conspirator, Thomas Cullen, were indicted in multiple counts, of orchestrating an intricate and protracted fraud upon the FHA and the Internal Revenue Service. Cullen ultimately pled guilty and testified for the government at Moscony's trial.

Count 1 of the redacted indictment charged Moscony with conspiracy to defraud the United States, in violation of 18 U.S.C. § 371. Two different methods of fraud were alleged—fraud by impeding HUD's proper functioning of the FHA mortgage insurance program, and fraud by impeding the proper functioning of the IRS. The jury, by special interrogatory, found that Moscony had conspired to defraud the United States through both methods.

As the detailed evidence at trial revealed overwhelmingly, the conspiracy that Moscony directed against the FHA involved numerous acts of fraud by Moscony and others. To conceal the buyer's or his own failure to produce the 3% minimum borrower's investment, Moscony sent the mortgage company false escrow letters grossly overstating the amount the buyer had on deposit at Moscony Real Estate. In this connection, Moscony often withheld from the mortgage company promissory notes that had been executed between the buyers and Moscony Real Estate which represented the difference between the money actually in escrow and the amount stated in the escrow letters. The evidence at trial strongly suggested that no effort was made to collect on these promissory notes, as they were nothing more than a sham. It was Moscony Real Estate office policy *not* to send these notes on to the mortgage company. Also in connection with the buyer's noncompliance with the 3% requirement, Moscony arranged, and arranged to conceal in several ways, "seller assists," whereby the seller essentially kicked back

to the buyer part of the purchase price, or assented to accept a lower gross amount for the home than that stated by the purchase agreement, to make it appear that the buyer had met the 3% minimum required investment. Although the FHA did not forbid seller assists *per se*, such arrangements had to be disclosed to ensure that the buyer, on his own, was still putting down at least 3% of the total acquisition cost of the home. Under Moscony's scheme, agreements for these "seller assists" were made in endorsements to the purchase agreements. It was Moscony Real Estate office policy *not* to send these endorsements on to the mortgage company.

Moscony also lied, or caused his clients to lie, about whether the home was to be used as a primary residence, about whether the FHA-guaranteed mortgage was an original mortgage or was to be used to refinance, and about the borrower's assets, liabilities, and income. Moscony also caused fraudulent settlement sheets to be executed at closings by cooperative settlement agents so that his various manipulations could be hidden. The evidence at trial showed that this "got to be an automatic thing...." Finally, but not exhaustively, because of the routine use of aliases throughout the transactions, Moscony-committed and Moscony-directed forgery was pervasive in connection with purchase agreements, FHA 2900's, escrow letters, settlement sheets, and checks. The net result of Moscony's activities was that the FHA insured the loans of persons, real and fictitious, which would not have been insured had the true state of affairs been properly revealed.

The fraud perpetrated upon the IRS generally involved transactions in which Moscony and Cullen were the sellers: the home would be sold under an alias and side checks for phony debts to fictitious third persons were used to draw off and conceal the proceeds of the sale. Additionally, the evidence at trial revealed that it was routine office practice at Moscony Real Estate

*not* to report to the IRS commissions made by Moscony and Cullen in deals involving homes owned by them.

Continuing with the indictment, Count 2 charged Moscony with violating the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962(c). "Moscony Real Estate" was alleged as the enterprise, and 79 individual racketeering acts were submitted to the jury, all of which were unanimously found by special interrogatory to have been proven beyond a reasonable doubt. Racketeering acts 1–18 were linked to Counts 3 through 22, which charged Moscony with separate violations of interstate transportation of money taken by fraud, 18 U.S.C. §§ 2314, 2 (Counts 3 through 20)—predicated upon the loan checks being drawn from the mortgage company's out-of-state account and being deposited in the abstract company's in-state account—, and with money laundering, 18 U.S.C. § 1956(a)(1)(B) (Counts 21 and 22)—predicated upon two incidents of drawing off and concealing profits through the issuance and cashing of checks written to fictitious persons from the loan proceeds. Racketeering Acts 19–20 were linked to Counts 23 and 24, which charged Moscony with obstruction of justice, 18 U.S.C. § 1503, in connection with destruction or concealment of materials subpoenaed by the grand jury. Racketeering Acts 21–97 alleged an additional 59 non-substantively-charged violations of interstate transportation of money taken by fraud.[1]

Counts 25 through 39 charged Moscony with making false statements, 18 U.S.C. §§ 1001, 2, in connection with 15 different false escrow letters. Counts 40, 44 and 47 through 54 charged Moscony with further false statements in connection with 10 different occasions of Moscony lying, or causing his customers to lie, on forms submitted to the FHA. 18 U.S.C. §§ 1001, 2. Finally, Counts 55 through 57 charged Moscony with filing false income tax returns, 26 U.S.C. § 7206(1), for 1983–1985.[2]

---

1. Certain of the racketeering acts were withdrawn by the government and were not presented to the jury, but it is not necessary to list them herein.

2. Certain of the counts were withdrawn and not presented to the jury.

Upon being convicted of all counts presented to the jury, Moscony was sentenced to a total of 80 months' imprisonment, 3 years' supervised release, a fine of $150,000, restitution to the United States of $418,000, and forfeiture of $250,000. The 80 months was imposed on the RICO count and, while there were custodial sentences on other counts as well, the 80 months was the effective sentence, as all custodial sentences were for less than 80 months and were concurrent with the RICO sentence.

## II. DISQUALIFICATION OF COUNSEL

We deal first with an issue with respect to Moscony's representation at trial. During the great part of the grand jury investigation phase of this case, from December of 1986 through approximately June 30, 1987, Moscony and Cullen, together with other Moscony employees including Elizabeth Thiel, Patrizia Napolitano, and Rosemary Siermine, were all represented by J. Shane Creamer of Sprague, Higgins and Creamer—this, despite several warnings from the government that the multiple representation might pose a conflict of interest. Shortly after the grand jury indicted Moscony and Cullen on June 22, 1988, the government, recognizing that Thiel, Napolitano, and Siermine were expected to be called as witnesses at trial, moved to disqualify the Sprague firm from representing Moscony. Thiel, Napolitano and Siermine joined in this motion and Thiel and Napolitano moved to suppress affidavits which they signed at Moscony's request and which he notarized. The affidavits were drawn up by Creamer based on information imparted by Thiel and Napolitano during separate interviews with him on June 17, 1987.[3] The district court held a hearing on the issue at which the government's evidence in main part consisted of the testimony of Thiel, Napolitano, and Siermine.

Thiel testified that she and the other Moscony employees had been told, at a general meeting held with Creamer at his office, that Creamer was representing

them all. She also testified that she believed him to be her attorney and, in fact, Creamer accompanied her to the United States Attorney's office when she went there to provide handwriting exemplars in response to a grand jury subpoena served upon her through Creamer. At that time Creamer had advised her to give the exemplars but not to answer any questions. She testified that she considered her communication to Creamer on July 17, 1987, to be confidential, specifically averring that what she had told Creamer was in "strict confidence" and that she wanted "it kept that way." She agreed that the affidavit prepared by Creamer and signed by her contained substantially all the information she had imparted to Creamer during the interview and that that information was truthful, though she testified that she did not know, at the July 17, 1987, interview, that the information was to be used to create an affidavit. Napolitano's testimony was substantially similar, although in her case Creamer had only met with her individually on one occasion, i.e., at the July 17, 1987, interview. Siermine, too, testified that she had had confidential communications with Creamer as her attorney. Although Siermine did not sign an affidavit and did not meet with Creamer individually, she testified that in a telephone conversation with Creamer she told him the substance of an interview she had had with the FBI.

On October 21, 1988, though noting that a criminal defendant is entitled to a presumption in favor of his counsel of choice, see *Wheat v. United States*, 486 U.S. 153, 164, 108 S.Ct. 1692, 1700, 100 L.Ed.2d 140 (1988), the district court nevertheless disqualified the Sprague firm from representing Moscony, finding an actual conflict of interest had arisen primarily because of Creamer's prior representation of Thiel and Napolitano. 697 F.Supp. 888 (E.D.Pa.1988). The court found that Thiel's trial testimony, which was to be corroborated by Napolitano, would be cen-

---

**3.** The affidavits, though withheld from the government at the hearing, were reviewed by the district court *in camera,* and were filed

under seal with this court as part of the appendix on appeal. We have reviewed them as well.

tral to the government's case, and that vigorous cross-examination of these witnesses would be necessary. The court also felt that such cross-examination, however, if foregone (which Moscony did not offer to do) would have deprived Moscony of his Sixth Amendment right to effective assistance of counsel (which Moscony did not offer to waive), and if pursued would have violated ethical standards regarding privileged communications (which the witnesses would not "waive" even if they could). Accordingly, the court determined that fairness, both to Moscony and to the witnesses, dictated the disqualification of the Sprague firm. *Id.* at 892–893.[4] We agree.[5]

As this court has previously noted, the "Sixth Amendment guarantee of effective assistance of counsel includes two correlative rights, the right to adequate representation by an attorney of reasonable competence and the right to the attorney's undivided loyalty free of conflict of interest." *United States v. Gambino*, 864 F.2d 1064, 1069 (3d Cir.1988) (*citing Government of Virgin Islands v. Zepp*, 748 F.2d 125, 131 (3d Cir.1984)), *cert. denied*, 492 U.S. 906, 109 S.Ct. 3215, 106 L.Ed.2d 566 (1989). The attorney's undivided loyalty is required because the type of effective "assistance of counsel" the Sixth Amendment guarantees a criminal defendant is that which puts the government to its proofs in an adversarial manner, and for this counsel free of conflicts of interest is necessary. *See United States v. Cronic*, 466 U.S. 648, 656, 656 n. 15, 661 n. 28, 104 S.Ct. 2039, 2045, 2045 n. 15, 2048 n. 28, 80 L.Ed.2d 657 (1984). Moscony, then, had the right to conflict-free representation.

However, another right is derived from the right to effective assistance of counsel, for "the right to counsel being conceded, a defendant should be afforded a fair opportunity to secure counsel of his own choice." *Powell v. Alabama*, 287 U.S. 45, 53, 53 S.Ct. 55, 58, 77 L.Ed. 158 (1932). The view is that a primary purpose of the Sixth Amendment is to grant a criminal defendant control over the conduct of his defense—as "it is he who suffers the consequences if the defense fails," *Faretta v. California*, 422 U.S. 806, 820, 95 S.Ct. 2525, 2533, 45 L.Ed.2d 562 (1975)—and "[a]n obviously critical aspect of making a defense is choosing a person to serve as an assistant and representative." *Wheat v. United States*, 486 U.S. at 166, 108 S.Ct. at 1700 (Marshall, J., dissenting). Thus, a presumptive right to the counsel of one's choice has been recognized as arising out of the Sixth Amendment, *see, e.g., Wheat v. United States*, 486 U.S. at 159, 108 S.Ct. at 1697, and, unless this presumption was somehow overcome, Moscony had the right to have Creamer represent him.

A final "right" enters the calculus of this case. Stemming not from the Sixth Amendment but from the ethical precepts that govern the legal profession, a client has a right not to have her communications with her attorney revealed.[6] Indeed, the rule in effect in the district court at the time the Sprague firm was disqualified forbade Creamer from revealing not only the confidential communications of his former clients but any and all information *"relating to"* his prior representation of the three women unless they gave their consent after consultation.[7] Furthermore,

---

4. Cullen was also a defendant at that time and so was involved in the proceeding. But as a matter of convenience, we are describing the ruling only in terms of Moscony.

5. The government regards this issue as involving mixed questions of law and fact and thus suggests we exercise plenary review. We will exercise that standard of review which, of course, is in Moscony's interest, but we question whether the standard of review should not be deferential. *See United States v. Defazio*, 899 F.2d 626, 629 (7th Cir.1990); *see also Wheat v. United States*, 486 U.S. at 162–64, 108 S.Ct. at 1699–1700.

6. This "right"—or more correctly, this ethical duty—complements, but is distinct from, the attorney-client privilege which is a right belonging to the client and which we discuss in further detail *infra*.

7. The rule provides, in part: "A lawyer shall not reveal information *relating to* representation of a client unless the client consents after consultation...." 204 Pa.Code § 81.4 (Rule 1.6(a)) (1990) (effective April 1, 1988) (emphasis added). And "[t]he duty not to reveal information relating to representation of a client continues after the client-lawyer relationship had termi-

Creamer was forbidden by the rules of professional conduct from representing Moscony if Moscony's interests were "materially adverse" to the interests of either Thiel, Napolitano, or Siermine,[8] and, most importantly, was essentially forbidden in his representation of Moscony from using information relating to the representation of either Thiel, Napolitano, or Siermine to their disadvantage.[9]

The unenviable duty of reconciling these various rights and duties—*i.e.*, Moscony's rights to conflict-free representation of counsel, and to have Creamer as his counsel; the right of Thiel, Napolitano, and Siermine not to have information relating to Creamer's representation of them revealed; and the duties of Creamer not to work against the interests of his former clients, and to not reveal, to their disadvantage, information relating to his prior representation of them—devolved upon the district court.

■■■ Usually, the various rights and duties of the attorney clash when a defendant seeks to waive his right to conflict-free representation in circumstances in which the counsel of his choice may have

divided loyalties due to concurrent or prior representation of another client who is a co-defendant, a co-conspirator, or a government witness. Such a waiver, however, does not necessarily resolve the matter, for the trial court has an institutional interest in protecting the truth-seeking function of the proceedings over which it is presiding by considering whether the defendant has effective assistance of counsel, regardless of any proffered waiver.[10] Moreover, to protect the critically important candor that must exist between client and attorney, and to engender respect for the court in general, the trial court may enforce the ethical rules governing the legal profession with respect both to client-attorney communications and to conflict-free representation, again regardless of any purported waiver. Finally, the court has an independent interest in protecting a fairly-rendered verdict from trial tactics that may be designed to generate issues on appeal. Accordingly, as we stated in *United States v. Dolan*, 570 F.2d 1177 (3d Cir.1978), quoted with approval by the Supreme Court in *Wheat v. United States*, 486 U.S. at 162, 108 S.Ct. at 1698–99:

nated." *Id.* (Rule 1.6(d)). *See also Local Rules of the United States District Court for the Eastern District of Pennsylvania* Civil Rule 14 (Rule IV(B)) (1988) (adopting Pennsylvania's Rules of Professional Conduct for use in the Eastern District of Pennsylvania); *id.* Criminal Rule 2 (making Local Civil Rule 14 fully applicable in all criminal proceedings). This rule, Rule 1.6, is considerably broader than the former rule under the Code of Professional Responsibility. As stated in the comment to the Rule:

Under the Code, DR 4–101, the requirement applies only to information 'gained in' the professional relationship that 'the client has requested be held inviolate or the disclosure of which would be embarrassing or would be likely to be detrimental to the client.' Rule 1.6 thus imposes confidentiality on information relating to the representation even if acquired before or after the relationship existed. It does not require the client to indicate information that is to be confidential, or permit the lawyer to speculate whether particular information might be embarrassing or detrimental. Furthermore, this definition avoids the constricted definition of 'confidence' that appears in some decisions.

In deciding the client-attorney communication issue on October 21, 1988, the district court relied on the less restrictive Code of Profession-

al Responsibility, apparently unaware that the new Rules of Professional Conduct had recently gone into effect on April 1, 1988. *See* 697 F.Supp. at 890. *But see United States v. Stout*, 723 F.Supp. 297 (E.D.Pa.1989) (court uses Rules of Professional Conduct to determine ethical considerations governing disqualification motion). As this could only have inured to Moscony's benefit, however, any error occasioned thereby was harmless, particularly as we are exercising plenary review. Our decision is predicated on the Rules rather than the Code, although we note that the district court's decision to disqualify would have been correct under either.

8. *See* 204 Pa.Code § 81.4 (Rule 1.9(a)) (dealing with conflicts of interest caused by prior representation). *See also Id.* (Rule 1.16(a)(1)) (withdrawal from representation of client mandatory if representation will result in violation of rules of professional conduct).

9. *See* 204 Pa.Code § 81.4 (Rule 1.9(b)).

10. This is certainly not to imply that if the district court accepts the waiver the defendant may later successfully complain about a conflict of interest. *See United States v. Pungitore*, 910 F.2d 1084, 1143 n. 84 (3d Cir.1990).

[W]hen a trial court finds an *actual* conflict of interest which impairs the ability of a criminal defendant's chosen counsel to conform to with the ABA Code of Professional Responsibility, the court should not be required to tolerate an inadequate representation of a defendant. Such representation not only constitutes a breach of professional ethics and invites disrespect for the integrity of the court, but it is also detrimental to the independent interest of the trial judge to be free from future attacks over the adequacy of the waiver or the fairness of the proceedings in his own court and the subtle problems implicating the defendant's comprehension of the waiver.

570 F.2d at 1184 (emphasis added).

Because of these various interests, then, and noting that "[t]he likelihood and dimensions of nascent conflicts of interest are notoriously hard to predict," 486 U.S. at 163, 108 S.Ct. at 1699, the Supreme Court in *Wheat* went one step further than this court had in *Dolan* and in *United States v. Flanagan,* 679 F.2d 1072, 1076 (3d Cir. 1982) (trial court may refuse waiver when actual conflict "very likely"), *rev'd on other grounds,* 465 U.S. 259, 104 S.Ct. 1051, 79 L.Ed.2d 288 (1984), and held that

the District Court must be allowed substantial latitude in refusing waivers of conflicts of interest not only in those rare cases where an *actual conflict* may be demonstrated before trial, but in the more common cases where a *potential for conflict* exists which may or may not burgeon into an actual conflict as the trial progresses.

486 U.S. at 163, 108 S.Ct. at 1699 (emphasis added).

■ Thus, not only when an actual conflict is found, but when there is "a showing of a serious potential for conflict," 486 U.S. at 164, 108 S.Ct. at 1700, the presumption in favor of a defendant's counsel of choice is overcome and the trial court may disqualify counsel and reject the defendant's waiver of conflict-free representation, *id.*

■ Here, of course, Moscony did not attempt to cure the conflict of interest problem by offering to forego cross-exami-

nation of Thiel and Napolitano. Thus, once the district court found a conflict of interest it quite properly disqualified Creamer. And, Moscony's contentions at trial and on appeal notwithstanding, an actual conflict of interest obviously existed. Conflicts of interest arise whenever an attorney's loyalties are divided, *United States v. Wheat,* 813 F.2d 1399, 1402 (9th Cir.1987), *aff'd,* 486 U.S. 153, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988), and an attorney who cross-examines former clients inherently encounters divided loyalties, *Lightbourne v. Dugger,* 829 F.2d 1012, 1023 (11th Cir.1987), *cert. denied,* 488 U.S. 934, 109 S.Ct. 329, 102 L.Ed.2d 346 (1988). *See also United States v. Wheat,* 813 F.2d at 1402 n. 1 ("A substantial relationship between successive representations often triggers concerns about divided loyalties and conflicts of interest"; *citing* Model Rule of Professional Conduct 1.9). Creamer could use the information obtained from Thiel and Napolitano at the July 17, 1987, interviews to cross-examine, and possibly impeach, them at Moscony's trial, *see* 697 F.Supp. at 891, but this he could not do without revealing information "relating to" his representation of them, and without using such information to the disadvantage of at least Thiel who, intimately involved in Moscony's scheme, was to be a key government witness under an immunity agreement whereby she could still be prosecuted if the government felt she had testified untruthfully.

Moscony characterizes the information imparted to Creamer as nothing more than mere "office procedures." But the very crux of the government's case revolved around office procedures and policies—such as the Moscony Real Estate policies of *not* forwarding to the mortgage company endorsements to purchase agreements or promissory notes, and of *not* reporting to the IRS commissions made by Moscony on the sales of Moscony-owned property. Information regarding such procedures, then, imparted by Thiel and Napolitano to their attorney at a time during the grand jury investigation when it was not at all certain that they themselves would not stand trial, was, under professional ethical standards,

confidential, *cf. United States v. Provenzano*, 620 F.2d 985, 1005 (3d Cir.) (attorney's access to privileged information conclusively presumed once attorney-client relationship established), *cert. denied*, 449 U.S. 899, 101 S.Ct. 267, 66 L.Ed.2d 129 (1980), and was clearly "related to" their representation by Creamer, *see* 204 Pa.Code § 81.4 (Rule 1.6(a) and (d)). Thus, as Creamer owed a duty to his former clients not to reveal this information, and as an actual conflict of interest therefore existed, the district court properly disqualified the Sprague firm.[11]

## III. SUPPRESSION OF EVIDENCE

In addition to disqualifying the Sprague firm, the district court held that the Thiel/Napolitano affidavits could not be used at trial because of the attorney-client evidentiary privilege.[12] Moscony claims that this ruling was wrong under the law of evidence governing the privilege, and impermissibly infringed upon his Sixth Amendment right to confront the witnesses against him.

■■■ In federal criminal cases, the privilege of a witness is governed by "the prin-ciples of the common law as ... interpreted by the courts of the United States in the light of reason and experience." Fed.R.Evid. 501. One privilege, long established, is the attorney-client privilege which protects from disclosure the confidential communications made by a client to her lawyer in furtherance of his representation of her. *See* S. Stone & R. Liebman, *Testimonial Privileges* § 1.01 at 4 (1983). Supreme Court Standard 503, though unpromulgated, "is a restatement of the traditional common law attorney-client privilege which had been applied in the federal courts prior to the adoption of the federal rules," J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 503[02] at 503-19 (1990). The Standard states, in part:

> A client has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of facilitating the rendition of professional legal services to the client, (1) between himself ... and his lawyer ..., or (3) by him ... to a lawyer representing another in a matter of common interest.

Sup.Ct.Stnd. 503(b), *reprinted in Weinstein's Evidence* ¶ 503 at 503-1.[13]

---

**11.** Of course, all of the above-mentioned rules of professional conduct applicable to Creamer as Moscony's counsel and as former counsel to Thiel, Napolitano, and Siermine, also applied to the entire Sprague firm *via* Creamer. *See Id.* (Rule 1.10(a)).

We also point out that it appears that the Sprague firm might ultimately have been disqualified from representing Moscony for another reason. It originally represented both Cullen and Moscony but after its disqualification Cullen obtained separate counsel and entered into a plea agreement pursuant to which he testified for the government. Thus, while ordinarily we would not undertake a harmless error analysis if an attorney is improperly disqualified, *Fuller v. Diesslin*, 868 F.2d 604, 607-09 (3d Cir.), *cert. denied*, — U.S. ——, 110 S.Ct. 203, 107 L.Ed.2d 156 (1989), here the situation might be different, as in this case a harmless error analysis would not focus on the performance of the substituted attorney at trial but rather on whether the Sprague firm would have in any event been out of the case. An analogy might be drawn to a situation in which a defendant is represented by an attorney who is improperly disqualified but dies or is disbarred before the trial. We question whether in such a case the defendant would be entitled to a new trial on the basis of the improper disqualification. In this regard, we observe that the most egregious constitutional error with only prospective impact may be cured if the course of events renders the error harmless. *See United States v. Sandini*, 888 F.2d 300, 305 n. 2 (3d Cir.1989), *cert. denied*, — U.S. ——, 110 S.Ct. 1831, 108 L.Ed.2d 959 (1990). Of course, we can never know what Cullen would have done if Creamer continued to represent him and thus we do not base our decision on this point.

**12.** The government regards this issue as raising a mixed question of law and fact subject to plenary review. We will exercise that standard of review, *see United States v. Furst*, 886 F.2d 558, 575 (3d Cir.1989), *cert. denied*, —— U.S. ——, 110 S.Ct. 878, 107 L.Ed.2d 961 (1990), though we point out that there are factual conclusions underlying the suppression order. Of course, Moscony cannot be prejudiced by our exercise of this standard of review.

**13.** Wigmore states the privilege thus:

> (1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by him-

■ Moscony claims that the information communicated to Creamer by Thiel and Napolitano at the July 17, 1987, conference was not "confidential," and was not imparted "for the purpose of seeking legal advice," as it related only to "office procedures." We do not agree. Both women credibly testified that when they spoke to Creamer as their attorney, they intended their communications to him to be held in confidence.[14] A communication is "confidential" if "not intended to be disclosed to third persons other than those to whom disclosure is in furtherance of the rendition of professional legal services to the client...." Sup.Ct.Stnd. 503(4). Furthermore, and as we have already noted, since "office procedures" were at the heart of the investigation in which Thiel and Napolitano had become ensnared, the witnesses' communications to Creamer were clearly intended to facilitate his rendition of legal services to them. Accordingly, the affidavits, containing confidential information given to an attorney by his clients to facilitate his representation of them, were *prima facie* protected from disclosure by the attorney-client privilege.

■ Moscony argues in the alternative, however, that Thiel and Napolitano waived the privilege when they signed the documents, entitled "Affidavit," in the presence of Moscony who notarized them. The contention is that by signing an affidavit—which, as a general matter, is designed to be shown to others—, and by doing so in front of Moscony who obviously knew its contents, the two women signaled their intent not to have the information contained therein treated as confidential.

It is generally true that "[i]f the client intended the matter to be made public, the requisite confidentiality is lacking. For example, information communicated by a client which he knew would be disclosed in legal documents, such as complaints, or in settlement negotiations is outside the privilege." *Weinstein's Evidence* ¶ 5039(a)(4)[01] at 503–39–40 (footnotes omitted). *See In re Grand Jury Proceedings,* 727 F.2d 1352 (4th Cir.1984) (information given to attorney to prepare prospectus to be published to others not privileged even though prospectus was never issued). *See also United States v. Furst,* 886 F.2d 558, 575 (3d Cir.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 878, 107 L.Ed.2d 961 (1990). This "rule," however, is not hard and fast, as it merely states the most common inference that a client does not intend information to be confidential where that information is to be disclosed in a kind of legal document generally made public. The ultimate key to determining confidentiality is intent, and Thiel and Napolitano both testified that they did not intend to waive confidentiality merely by signing a document captioned, "Affidavit." The testimony of Thiel and Napolitano amply supported the district court's finding that "the witnesses are unsophisticated lay persons who were not advised by defense counsel or anyone else that information they divulged [in the affidavits] would not be confidential," 697 F.Supp. at 892 n. 3, and more than adequately revealed that they did not intend to waive confidentiality by signing the affidavits.[15] While a client's professed intent or belief as to confidentiality is not controlling where unreasonable, we hold that the belief of Thiel and Napolitano that the affidavits would not be made public was reasonable under the circumstances.[16]

---

self or by the legal adviser, (8) except the privilege be waived.
VIII *Wigmore On Evidence* § 2292 at 554 (McNaughton rev.1961).

**14.** Indeed, Thiel testified that she had expressed concern about the presence of another man when she spoke with Creamer and was assured that he was an employee of the Sprague firm who was there to take notes.

**15.** Exercising plenary review we reach the same conclusion.

**16.** On direct examination at the hearing on the motion to suppress and disqualify, Thiel testified:

Q Did you consider what you said to [Creamer on July 17, 1987] to be confidential?
A Yes, I did.
Q Did there come a time after that meeting when you were asked to sign something by Mr. Moscony?
A Yes.
Q Did you have a chance to read and study what you were asked to sign?

Furthermore, while it is also generally true that information published to a third party is deemed non-confidential and therefore unprotected by the attorney-client privilege, *see Wigmore On Evidence* § 2327 at 634–35; *Testimonial Privileges* § 1.45 at 78, it has been held that the incidental communication of information to a co-client while communicating with one's attorney, does not constitute waiver of the privilege, *see Weinstein's Evidence* ¶ 503(b)[06] at 503–100; *Testimonial Privileges* § 1.55 at 92. "Communications to an attorney to establish a common defense strategy are privileged even though the attorney represents another client with some adverse interests." *Eisenberg v. Gagnon,* 766 F.2d 770, 787–88 (3d Cir. 1985). *See also* Sup.Ct.Stnd. 503(b)(3). It is only when the clients' interests are completely adverse that the privilege will be denied. *Eisenberg v. Gagnon,* 766 F.2d at 788; *Weinstein's Evidence* ¶ 503(b)[06] at 503–100–01. Here, of course, the only reason Moscony, Thiel, and Napolitano shared Creamer as an attorney was for the purpose of a common defense, and Thiel and Napolitano signed the affidavits at Moscony's request because they had been told that Creamer needed them for that defense. Moreover, the affidavits were executed during the grand jury investigation of the case, so it could hardly be said that, at that nascent stage, the interests of Thiel and Napolitano were completely adverse to Moscony's. Thus, Thiel and Napolitano did not waive the privilege by "showing" the affidavits to their co-client Moscony by signing them in his presence, at his request. *See* Sup.Ct.Stnd. 503(b)(3) (privilege covers communications made to lawyer representing another in matter of common interest); *Weinstein's Evidence* ¶ 503(a)(4)[01] at 503–42 ("Disclosure to those reasonably necessary for transmitting the communication [to the attorney] has readily been recognized as not destroying the privilege").

In sum, the affidavits were covered by the attorney-client privilege, and the district court properly protected them from disclosure.

Finally, the suppression of the affidavits did not infringe upon Moscony's right to confront the witnesses against him through full cross-examination. Although Moscony's substituted counsel was properly precluded from using the affidavits at trial and from inquiring of Thiel and Napolitano as to what they told Creamer on July 17, 1987, he was perfectly free to question the two witnesses about the matters asserted in the affidavits. *See Testimonial Privileges* § 1.24; *Weinstein's Evidence* ¶ 503(b)[03] at 503–53. The record reveals that at trial Moscony's counsel *and* the government brought out the matters involved in the affidavits, and Moscony's counsel was given a full and fair opportunity to cross-examine Thiel and Napolitano in relation thereto. Accordingly, the suppression of the affidavits did not offend the Sixth Amendment. *See, e.g., Jenkins v. Wainwright,* 763 F.2d 1390, 1392–93 (11th

---

A I'm sure I looked it over, yes.
Q Did you ask Mr. Moscony anything about whether or not you should consult with Mr. Creamer concerning this?
A No. I was just told to sign it and I signed it.
Q Did you consider while signing that document you'd be waiving any privilege you had concerning conversations you had with Mr. Creamer?
A No, it never entered my mind.

Q And did you expect that affidavit to be made public?
A No.
Q What did you think the affidavit was for?
A For Mr. Creamer's file.
On direct examination at the same hearing Napolitano testified:

Q Did you have any intent to waive any attorney-client privilege by signing that affidavit?
A Do you mean did I give him the right to talk about it?
Q Yes.
A No, I didn't give anybody that right.
Q Did you consider what was the substance of that affidavit to be private?
A Yes.
On cross-examination by Creamer she testified:
Q At the time that you signed the affidavit what did you think was going to be done with it?
A I thought it was going to be given to you and that was it.

Cir.1985), *cert. denied*, 476 U.S. 1164, 106 S.Ct. 2290, 90 L.Ed.2d 730 (1986).

## IV. SENTENCING ISSUES

Moscony's next challenge revolves around the application of the Sentencing Guidelines to this case.[17] As the Probation Department's presentence investigation report correctly pointed out, "the great bulk of the criminal activity" in this case occurred prior to November 1, 1987. Accordingly, in connection with the majority of the counts of which he was convicted, Moscony was sentenced without application of the guidelines. In Counts 23 and 24, however, Moscony was convicted of obstruction of justice in connection with despoiling evidence and concealing it from the grand jury, and with lying to the grand jury concerning these activities. Moscony's obstruction of justice began before November 1, 1987, the effective date of the guidelines, but as it was continued after that date, the guidelines were used in the sentencing on those two counts, an application Moscony does not challenge. Rather, he claims that the district court should not have used the guidelines on his RICO conviction under Count 2. He asserts that the use of the guidelines on that count was: (1) error as a matter of general sentencing law; (2) a violation of the *ex post facto* clause, U.S. Const. art. I, § 9, cl. 3; and (3) a denial of substantive due process.

▆▆▆▆ Moscony first claims that the district court should not have applied the guidelines to Count 2, as RICO is not the type of continuing offense, or "straddle crime" to which this and other courts of appeals have held the Guidelines applicable where its commission continued *after* November 1, 1987, though the violation began *before* that date. *See, e.g., United States v. Story*, 891 F.2d 988, 994 (2d Cir.1989); guidelines § 1B1.3(a)(1) (conduct relevant to determining guideline range includes all acts committed by defendant during commission of offense of conviction). This argument was considered and rejected by the district court. Noting that this court had

already held that the guidelines are applicable to a conspiracy conviction where a defendant's participation in the conspiracy continues after November 1, 1987, *see United States v. Rosa*, 891 F.2d 1063, 1068–69 (3d Cir.1989), the district court held that RICO is a continuing offense "directly analogous to the crime of conspiracy," and that sentencing for Moscony's RICO conviction should therefore be governed by the guidelines.

We agree. Moscony engaged in a pattern of racketeering activity which, though commenced before November 1, 1987, continued after that date, and, accordingly, application of the guidelines was *prima facie* proper. *See United States v. Cusack*, 901 F.2d 29, 32 (4th Cir.1990) (RICO is "straddle" crime to which guidelines apply). For this reason, too, Moscony's *ex post facto* clause challenge to application of the guidelines to the RICO conviction fails. Congress enacted RICO in 1970. Pub.L. 91–452, Title IX, § 901(a), 84 Stat. 942 (1970). Since Moscony elected to continue his clearly illegal pattern of racketeering activity after the effective date of the guidelines, and since the guidelines do not in any case prescribe a sentence higher for RICO than that prescribed by pre-guidelines statute, "this is not a case in which application of a new law will either render criminal that which was innocent when done or impose sanctions that were ineffective during the culpable conduct." *See United States v. Rosa*, 891 F.2d at 1069. Thus, no *ex post facto* clause violation was occasioned by application of the guidelines. *United States v. Edgecomb*, 910 F.2d 1309, 1311 (6th Cir.1990) (guidelines apply to "straddle" crimes; no *ex post facto* violation as guidelines' penalty not more severe than pre-guidelines statutory penalty).

▆▆▆▆ Moscony's final challenge to application of the guidelines is a claim that he was denied substantive due process because the guidelines, in essence, allowed the prosecutor to divest the district court

---

**17.** We exercise plenary review on this issue. *United States v. Nottingham*, 898 F.2d 390, 392

·(3d Cir.1990); *United States v. Ortiz*, 878 F.2d 125, 126–27 (3d Cir.1989).

of discretion in sentencing him. Moscony urges that this was accomplished as the prosecution converted what was in actuality a pre-guidelines case into a guidelines case by charging the two post-November 1, 1987, obstruction of justice racketeering acts. While recognizing that, *per United States v. Frank*, 864 F.2d 992, 1009–10 (3d Cir.1988), *cert. denied*, 490 U.S. 1095, 109 S.Ct. 2442, 104 L.Ed.2d 998 (1989), he does not have a substantive due process right to individualized sentencing in what he describes as "some abstract sense," Moscony contends that the particular application of the guidelines to his RICO conviction is grossly unfair. This contention is based on the purportedly anomalous result that, while the obstruction of justice charges were the only racketeering acts which "arguably" extended into the guidelines era, and while the charging of the obstruction of justice acts was the only thing that led to application of the guidelines, Moscony's sentence on the RICO conviction was, *per* the guidelines, essentially determined by the money laundering racketeering acts—acts which substantially pre-dated the guidelines' implementation.[18]

Viewed in this artificial, dissected fashion, Moscony's argument has some facial appeal. Reality, however, intrudes. It is undeniable that Moscony's pattern of racketeering activity continued after the guidelines became effective. Once it became clear that the grand jury was on the trail of the enterprise's illegal activities, Moscony engaged in wholesale destruction and concealment of subpoenaed business records.[19] Thus, when Moscony chose to commit his acts of obstruction of justice—which, being designed to cover up the illegal affairs of the enterprise, were part and parcel of his racketeering activity—, the guidelines were in force and clearly indicated that his RICO sentence would be primarily fashioned by the offense level prescribed for money laundering. As Moscony specifically forswears any claim of prosecutorial misconduct or vindictiveness, (brief at 37), *see United States v. Oliver*, 787 F.2d 124, 125 (3d Cir.1986), it is irrelevant that the prosecution could have kept the RICO charge from falling under the guidelines by failing to include Moscony's obstruction of justice as racketeering acts because "so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion." *Bordenkircher v. Hayes*, 434 U.S. 357, 364, 98 S.Ct. 663, 668, 54 L.Ed.2d 604 (1978).[20] Moscony was on at least constructive notice of what the guidelines provided, he continued to violate RICO after the guidelines became effective, and was sentenced under the guidelines. This, we think, is the acme of fairness. That the district court "had" to sentence Moscony under the guidelines, then, was fair for it reflected Moscony's conduct as described in the indictment. Accordingly, Moscony's substan-

---

**18.** The guideline for RICO, guidelines § 2E1.1, prescribes as a base offense level the greater of either 19 or the offense level applicable to the underlying racketeering activity. Where there is more than one type of racketeering activity, each underlying offense is treated as if it were a separate count of conviction. These separate "counts of conviction" are then "grouped" pursuant to chapter three of the guidelines. If the resultant base offense level of the underlying conduct is greater than 19, it, rather than 19, is used as the base offense level of the RICO conviction. Guidelines § 2E1.1, comment. (n. 1).

Here there were two groups, money laundering and fraud. After adjustments, the money laundering group was determined to have a base offense level of 26, whereas the fraud-related group had a base offense level of 23. The money laundering group, being the higher of the two, *see* guidelines § 3D1.4, and having a base offense level higher than 19, was therefore used to calculate the adjusted base offense level for the RICO conviction. The offense level for Moscony's RICO conviction, then, was indeed ascertained primarily by reference to the pre-November 1, 1987, money laundering racketeering acts.

**19.** For instance, Napolitano testified that after the grand jury subpoenas had been served, Moscony directed her to rip up receipts and promissory notes from the 1986 office files and put them in a trash bag. She gave the bag to Moscony who put it in the trunk of his car and she never saw it again.

**20.** In any event, even without this concession, there is no evidence of prosecutorial misconduct or vindictiveness.

tive due process rights were not violated by the use of the guidelines.

## V.  PRO SE ISSUES

Although represented by counsel on appeal, Moscony has, with leave of this court, filed a *pro se* brief advancing a number of arguments why his conviction is invalid and should be reversed.  He asserts:

(1) As a matter of law, Moscony was unprosecutable.  His real estate activities are non-criminal, and therefore his conviction should be reversed and the indictment dismissed.

(2) The mortgage companies were never an 'agent' of the HUD/FHA.

(3) Count two and counts three through count twenty must be dismissed as they do not reach the level of legal sufficiency to be crimes under Title 18 United States Code Section 2314 '... transporting money *taken by fraud, knowing the money to have been taken by fraud.'*

(4) The settlement checks were worthless at the time they were transported.

(5) The government did not prove the settlements were accomplished with and taken by fraud.

We have carefully considered these points, including the elaboration on them in his brief, and find that his *pro se* contentions are clearly without merit.

## VI.  CONCLUSION

The district court properly disqualified Moscony's original trial counsel due to conflicts of interest, and Moscony's presumptive, though limited, right to the counsel of his choice was not thereby violated.  The court's suppression of the Thiel/Napolitano affidavits was proper under the attorney-client privilege and did not deprive Moscony of his right to adequately cross-examine the witnesses against him.  Moreover, application of the guidelines to Moscony's RICO conviction was proper and was a violation neither of substantive due process nor the *ex post facto* clause.  Finally, the numerous assignments of error made by Moscony *pro se* are without merit.  Accordingly, the judgment of conviction and sentence entered July 13, 1990, will be affirmed.