**UNITED STATES of America,**

v.

**Neil MOSES, Appellant.**

**No. 01–3787.**

United States Court of Appeals,
Third Circuit.

Argued Dec. 2, 2002.

Decided Feb. 3, 2003.

**550**

Patrick C. Askin (Argued), Office of United States Attorney, Philadelphia, PA, for Appellee.

Arthur R. Shuman (Argued), Wyndmoor, PA, for Appellant.

Before ROTH, SMITH and CUDAHY,* Circuit Judges.

## OPINION

SMITH, Circuit Judge.

Appellant Neal Moses appeals from a judgment imposed after a jury convicted him of four offenses under the Controlled Substances Act.[1] Moses raises a number of legal issues, but his principal arguments concern: (1) the District Court's disqualification of the attorney he had retained; and (2) the District Court's refusal to allow Moses to choose his own attorney thereafter. For the reasons set forth below, we will affirm.[2]

---

* Honorable Richard D. Cudahy, Circuit Judge for the United States Court of Appeals for the Seventh Circuit, sitting by designation.

1. Counts one and two of the superseding indictment filed on October 4, 2000 charged Moses with violating 21 U.S.C. § 841(a)(1) and (b)(1)(A) by knowingly and intentionally distributing cocaine base (crack) on or about June 20 and July 7, 2000. The third count charged that, in violation of 21 U.S.C. § 846, Moses and co-defendant Jermaine Whitfield, knowingly and intentionally conspired and agreed to distribute cocaine base (crack). Count four alleged that on or about July 13, 2000 Moses and Whitfield "knowingly and intentionally possessed with the intent to distribute and aided and abetted the possession with the intent to distribute" of more than fifty grams of cocaine base (crack) in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A), and 18 U.S.C. § 2.

2. Moses also submits that the District Court erred because it: (1) denied his *pro se* motions to suppress certain audiotapes and physical evidence; (2) denied his Rule 29 motion as to the counts of conspiracy and the possession with the intent to distribute on July 13; (3) refused to rule on his post-trial motion alleging a *Brady* violation, *see Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); and (4) sentenced him pursuant to 21 U.S.C. § 841, which in his view allows the judge, contrary to *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), to determine at sentencing the identity and quantity of the controlled substance at issue by a preponderance of the evidence. These arguments are without merit. A review of the record confirms not only that the identity and quantity of the controlled substance were submitted in special interrogatories to the jury to determine beyond a reasonable doubt as required by *Apprendi*, but also that there was sufficient evidence to support Moses' conviction on the conspiracy count and the charge of possession with the intent to distribute on July 13. The refusal to address Moses' post-trial motion was not error because it was untimely under Fed. R.Crim.P. 33 and the District Court was "powerless to entertain" the motion. *United States v. Gaydos*, 108 F.3d 505, 512 (3d Cir. 1997). Nor was there error in denying Moses' *pro se* motions to suppress made after the introduction of the evidence. As the Court explained, the drugs seized from the home of his cousin, Dermont Cheeseboro, were appropriately introduced because they were seized during a consensual search. The audiotapes, made with the consent of either the government's informant or the undercover agent, complied with the requirements of 18 U.S.C. § 2511(2)(c).

## I.

The district court had jurisdiction over this criminal matter pursuant to 18 U.S.C. § 3231. We have jurisdiction under § 1291 because the judgment of conviction is a final order.

## II.

Appellant Neal Moses and co-defendant Jermaine Whitfield were indicted in August 2000. A superseding indictment was filed on October 4, charging Moses with two counts of distribution of crack cocaine, one count of possession with the intent to distribute crack cocaine, and one count of conspiracy to distribute crack cocaine in violation of 21 U.S.C. § 846. The charges stemmed from an undercover drug operation which utilized a government informant, Joseph Goff, and a Kell transmitter to tape record certain conversations that occurred during the controlled drug buys.

Goff, in the company of undercover Officer Brown, purchased crack cocaine from Moses on June 20 and July 7, 2000 outside of a residence at 2554 Sheridan Street, Philadelphia, where Dermont Cheeseboro, Moses' cousin, and Cheeseboro's girlfriend, Carmen Brown, lived. On July 13, Goff and Officer Brown arranged for the purchase of a quarter pound of crack from Moses. While they waited with Moses outside the Sheridan Street residence, Whitfield arrived with the crack and entered the home. Once he was inside, Whitfield observed the police arrest Moses. Although Whitfield tried to hide the crack, it was discovered during a consensual search of the residence.

Attorney Gregory Pagano entered his appearance for Moses about a month after the filing of the indictment. At some point, Pagano also entered his appearance for Whitfield in an unrelated "state gun case." In light of these circumstances, the government moved on January 10, 2001, to disqualify Attorney Pagano as Moses' counsel, asserting that there was a "non-waivable conflict of interest." Whitfield, represented by an assistant federal public defender, pled guilty to counts three and four of the federal superseding indictment on January 19, 2001.

A hearing on the motion for disqualification was conducted on February 16 by the District Court. During that hearing, the prosecutor advised the Court that Whitfield had "entered into a proffer agreement with the Government and had also agreed to cooperate and testify against Mr. Moses." Thus, Whitfield was certain to be a witness if the case proceeded to trial. Pagano opposed the motion and pointed out that the state case against Whitfield had been adopted by the federal government and that he no longer represented Whitfield. He conceded, however, that he would be placed in the position of cross-examining his former client. When asked what his views were, Moses indicated that he still wanted Pagano to serve as his counsel.

> The trial court advised Moses that the things [Pagano] learned while he was representing [Whitfield] he would still be required to keep in confidence under our ethical standards required of an attorney. And Mr. Pagano would have to cross-examine Mr. Whitfield if he appeared aggressively, because he would be a very important witness in the case, and anyone who was representing you would have to do something with [Whitfield] in front of the jury in order to reduce the effect of that witness' testimony.
>
> And in the process your attorney would have to try to do that without using information that he had gained in confidence while he was an attorney representing [Whitfield] in a prior matter.

The court further expressed its unwillingness to let Moses waive the conflict because it did not believe Pagano should be placed in such a predicament. Moreover, the District Judge did not want to face an ineffective assistance of counsel claim down the road. The court stressed that the certainty of Whitfield's testimony at trial made the conflict non-waivable. Because Attorney Rocco Cipparone represented Moses in another criminal proceeding before Judge Schiller, a proceeding that the government was going to seek to consolidate with this criminal case, Judge Kelly appointed Attorney Cipparone to represent Moses in the instant matter. He then continued the trial until May to afford Cipparone time to prepare Moses' defense.

During a pre-trial hearing on May 7, the Court addressed several outstanding motions, including the prosecution's motion to admit certain audiotapes. The hearing focused on the authenticity and accuracy of the tape recordings as a foundation for their admissibility under *United States v. Starks*, 515 F.2d 112, 121 (3d Cir.1975). At one point, Moses himself objected to the accuracy of the tapes and the indictment. Near the end of the hearing, Moses requested another attorney, alleging that Cipparone had failed to communicate with him. Cipparone advised the Court that he had conferred with Moses at the jail the week before and had diligently prepared Moses' case for trial. The District Court denied Moses' request for new counsel and concluded that the tape recordings were authentic and accurate.

Jury selection was scheduled for the following morning. Before the panel was convened in the courtroom, Moses complained that he and Cipparone were "not on a working level." He expressed his desire to "get another paid attorney[.]" The Court noted that, after Pagano's dis-

qualification, Moses had signed an affidavit that he did not have the resources to pay an attorney. Moses responded to this by asking for counsel of his choice. The Court explained to Moses that he did not have the right to choose a particular lawyer when he was unable to afford retained counsel. Moses protested that he had never wanted Cipparone, but denied any desire to represent himself. When Moses indicated that his family was trying to obtain the money for a paid attorney and that he was waiting for them to arrive, the Court took a recess. However, when none of Moses' family appeared, the Court proceeded to jury selection. Although Moses claimed that he did not have any relationship with his counsel, Cipparone advised the Court that he had not had any angry words with Moses and that he was willing to continue to represent Moses at trial. The Court again denied Moses' request for another attorney and proceeded to jury selection.

After opening statements, Officer Brown, the undercover agent involved in the controlled buys, testified regarding the events that occurred on June 20, July 7, and July 13. Trial resumed on May 9 with Joseph Goff, the government's informant, testifying first. Before the jury was seated, Moses again moved "for the right ... to have counsel of my own.... Mr. Cipparone is not my attorney. I do not intend to represent myself and Mr. Cipparone is not my attorney." Moses explained that he "never sat down with Mr. Cipparone and went over anything about this case to prepare for trial." The Court denied Moses' motion.

Trial proceeded and the prosecution called not only its informant, Goff, but also Cheeseboro, Carmen Brown, a chemist, an expert in the field of drug trafficking, Whitfield and Agent Richter, who was the officer in charge of the surveillance opera-

tion. After the government rested, Cipparone moved for a directed verdict on counts three and four, which charged Moses with criminal conspiracy and possession with the intent to distribute crack cocaine on July 13. The court denied the motion. The defense called Agent Richter to ask additional questions about the audiotapes, and then rested. The jury returned a verdict of guilty on all four counts on May 15, 2001. On October 1, the Court denied Moses' motion for a new trial and sentenced him to 240 months imprisonment. This appeal followed.

## III.

The Sixth Amendment to the Constitution guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defence." This guarantee of effective assistance encompasses "the right to adequate representation by an attorney of reasonable competence and the right to the attorney's undivided loyalty free of conflict of interest." *United States v. Gambino,* 864 F.2d 1064, 1069 (3d Cir. 1988); *see also Mickens v. Taylor,* 535 U.S. 162, 122 S.Ct. 1237, 1247, 152 L.Ed.2d 291 (2002) (Kennedy, J., concurring) (citing *Strickland v. Washington,* 466 U.S. 668, 685, 686, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)). In addition, the right to counsel includes the right to "secure counsel of his own choice." *Powell v. Alabama,* 287 U.S. 45, 53, 53 S.Ct. 55, 77 L.Ed. 158 (1932).

> [W]hile the right to select and be represented by one's preferred attorney is comprehended by the Sixth Amendment, the essential aim of the Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers.

*Wheat v. United States,* 486 U.S. 153, 159, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988). Thus, the "right to choose one's own counsel is circumscribed in several respects." *Id.* While a district court "must recognize a presumption in favor of petitioner's counsel of choice ... that presumption may be overcome not only by a demonstration of actual conflict but by a showing of a serious potential for conflict." *Id.* at 164.

In determining whether the disqualification of a defendant's retained attorney violates a defendant's right to choose his own counsel, this court must conduct a two step analysis. First, we must review "whether the district court's disqualification was arbitrary[.]" *United States v. Stewart,* 185 F.3d 112, 120 (3d Cir.1999) (citing *United States v. Voigt,* 89 F.3d 1050, 1074 (3d Cir.1996)). Second, we must determine whether the District Court abused its discretion. *Stewart,* 185 F.3d at 120.

The first step of this analysis focuses on whether the record was sufficiently developed "to enable the district court to make a reasoned and well-informed decision." *Voigt,* 89 F.3d at 1076. "As long as the court makes a 'reasoned determination on the basis of a fully prepared record,' its decision will not be deemed arbitrary." *Id.* (quoting *Fuller v. Diesslin,* 868 F.2d 604, 609 n. 4 (3d Cir.1989)).

Here, Moses contends that the record was not sufficiently developed because the District Court failed to establish whether there was, in fact, a conflict presented by Pagano's former representation of Whitfield. According to Moses, Whitfield was obligated by his plea agreement to provide complete and accurate information to the government. In turn, that information had to be disclosed by the government to Moses' counsel pursuant to

*Giglio, Brady,* and the Jencks Act.[3] Thus, the potential for conflict, in Moses' view, was remote. As a result, Moses contends that, instead of assuming that there were confidential communications "outside of the *Giglio/Brady/Jencks* ambit" that would have precluded Pagano from proceeding with his representation of Moses, the District Court should have conducted an *in camera* proceeding to determine if there actually were such communications.

We do not agree. It was established during the hearing that Pagano's former client (Whitfield) was going to be called to testify on behalf of the government during his current client's (Moses') trial and that Pagano would have to cross-examine Whitfield. Thus, it was clear that, if this case proceeded to trial, Pagano's loyalties would have been divided and there would have been an actual conflict of interest. *See United States v. Moscony,* 927 F.2d 742, 749 (3d Cir.1991) ("Conflicts of interest arise whenever an attorney's loyalties are divided, and an attorney who cross-examines former clients inherently encoun-

ters divided loyalties."). Consequently, Pagano's ability to cross-examine Whitfield was limited under Rule 1.6(a)[4] and Rule 1.9(b)[5] of the Pennsylvania Rules of Professional Conduct.[6]

Nor do we believe that the District Court was obligated to inquire into the nature and extent of the confidences between Pagano and Whitfield because Rule 1.6's mandate is clear: the attorney "shall not reveal information relating to the representation of a client." Indeed, we recognized as much in *United States v. Provenzano,* 620 F.2d 985, 1005 (3d Cir.1980), where we concluded that the District Court properly disqualified an attorney in a criminal matter because of his former representation of a government witness. We explained that:

> although the district judge did not make explicit findings that [the attorney] knew specific facts that would have involved him in conflict, the district court correctly concluded that he must assume as much, since he could not actually inquire

---

**3.** *See Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); and 18 U.S.C. § 3500 of the Jencks Act.

**4.** Rule 1.6(a) mandates that a "lawyer shall not reveal information relating to representation of a client unless the client consents after consultation[.]" While there are certain exceptions, none of those apply here and the record fails to establish any waiver by Whitfield to Pagano's use of any disclosures the former made during their relationship.

**5.** Rule 1.9(b) specifies that a "lawyer who has formerly represented a client in a matter shall not thereafter ... use information relating to the representation to the disadvantage of the former client[.]" Here, there was a possibility that Pagano's cross-examination may have revealed information that Whitfield had yet to divulge to the government, thereby placing Whitfield at a disadvantage for sentencing

purposes because of his lack of candor to the government.

**6.** *Moscony* recognizes that a conflict of interest may arise under numerous factual situations, including, *inter alia,* those situations in which an attorney, who formerly represented a client, represents another individual in a matter that is the same as or substantially related to the interests of the former client. 927 F.2d at 749 (citing *United States v. Wheat,* 813 F.2d 1399, 1402 n. 1 (9th Cir.1987) (citing Model Rule of Professional Conduct 1.9), *aff'd,* 486 U.S. at 159); *see also* Pa. Rule of Professional Conduct 1.9(a). Inquiry into whether there was a substantial relation between Whitfield's state gun case and the federal indictment, however, was unnecessary here because Pagano had already advised the Court that the matters were unrelated and there was a patent conflict resulting from the fact that Pagano's loyalties would be divided between his former client (Whitfield) and his current client (Moses) at trial.

about the matter without thereby destroying the confidence.

That reasoning is apposite here, particularly in light of the fact that Pagano represented Moses and Whitfield—albeit in different fora—while they were both charged in a federal indictment with conspiring to possess crack cocaine with the intent to distribute.

We recognize that the prosecution's obligations under *Giglio, Brady* and the Jencks Act may have resulted in the disclosure of some of the confidential communications between Pagano and Whitfield, thus mitigating the conflict with respect to those statements. The prosecution's obligations under *Giglio, Brady* and the Jencks Act, however, are separate and distinct from Pagano's duty of confidentiality to his former client. The duty of confidentiality is potentially, and usually will be in practice, broader than a witness' duty to disclose information with respect to a specific crime under a plea agreement. Thus, the potential for conflict in spite of such a plea agreement continues to exist.

Accordingly, we turn to whether the District Court abused its discretion. In *Moscony,* we reiterated that the nature of the conflict was not the only factor warranting consideration in determining whether to disqualify a defendant's chosen counsel. 927 F.2d at 749. Thus, courts may consider not only the "institutional interest in protecting the truth-seeking function of the proceedings," but also the interests behind the attorney-client privilege and the integrity of a fairly rendered verdict. *Moscony,* 927 F.2d at 749. In this case, the District Court fully considered all of these factors and did not abuse its discretion in disqualifying Pagano.

## IV.

■ Moses submits that, even if the District Court's disqualification of Pagano was not arbitrary, his Sixth Amendment right to the counsel of his choice was violated by the appointment of counsel and the foreclosure of any opportunity to retain other counsel of his choice. Although an indigent criminal defendant has a right to be represented by counsel, he does not have a "right to have a particular attorney represent him and therefore must demonstrate 'good cause' to warrant substitution of counsel." *United States v. Iles,* 906 F.2d 1122, 1130 (6th Cir.1990); *see also United States v. Young,* 482 F.2d 993, 995 (5th Cir.1973). Thus, a "request to dismiss counsel just before (or during) trial" requires that a court "ascertain the defendant's reasons for his dissatisfaction with counsel." *United States v. Peppers,* 302 F.3d 120, 132 (3d Cir.2002) (citing *United States v. Welty,* 674 F.2d 185, 187 (3d Cir.1982)). If good cause exists, "the court is required to grant a continuance and appoint new counsel, unless the defendant expressly wishes to proceed pro se." *Peppers,* 302 F.3d at 132. In the absence of good cause, however, "the court must inform the defendant that he can either proceed with current counsel, or represent himself." *Id.*

Good cause for the substitution of counsel is defined as a "conflict of interest, a complete breakdown of communication, or an irreconcilable conflict with the attorney." *United States v. Goldberg,* 67 F.3d 1092, 1098 (3d Cir.1995) (citing *Welty,* 674 F.2d at 188). Mere dissatisfaction with counsel does not constitute good cause. In addition to considering whether there is good cause, district courts must also consider the efficient administration of justice and "guard[ ] against manipulation and delay." *Goldberg,* 67 F.3d at 1098. "If the district court denies the request to substitute counsel and the defendant ... proceeds with unwanted counsel, we will not find a Sixth Amendment violation unless

the district court's 'good cause' determination was clearly erroneous or the district court made no inquiry into the reasons for the defendant's request to substitute counsel." *Id.*

Here, the denial of Moses' request for counsel of his own choosing did not offend his Sixth Amendment rights. The record shows that the Court inquired into the reasons for Moses' request and learned that he wanted to select his own counsel, despite his indigent status, because he felt that Cipparone had failed to communicate with him about the preparation of his defense and because he thought his family might have obtained the funds necessary to retain new counsel. The record shows, at a minimum, that Cipparone filed two pretrial motions on Moses' behalf and conferred with Moses the week before trial. While Moses' dissatisfaction with Cipparone's appointment was evident, Cipparone's willingness to continue to represent Moses undermined any assertion that there was an irreconcilable breakdown in communication. Indeed, the record indicates that Moses and Cipparone communicated at various points during the trial.

Moreover, the District Court indulged Moses' request to wait for the arrival of certain family members who were allegedly bringing money to retain counsel of his own choosing. When no one appeared, the Court appropriately proceeded with the selection of a jury. We find no error by the District Court in denying Moses' last minute request for new counsel.

We will affirm the judgment of the District Court.