**UNITED STATES of America**

v.

**Leonard PATRICK, D.V.M.**

**No. CRIM. A. 97–15.**

United States District Court,
E.D. Pennsylvania.

Oct. 2, 1997.

Suzanne B. Ercole, U.S. Attorney's Office, Philadelphia, PA, for Plaintiff.

Francis J. Hartman, Hartman, Marks & Nugent, Moorestown, NJ, Glenn A. Zeitz, Philadelphia, PA, for Defendant.

### MEMORANDUM

NEWCOMER, District Judge.

Presently before this Court are Defendant's Motion for Judgment of Acquittal, and in the Alternative, Motion for Arrest of Judgment or for a New Trial Pursuant to Rules 29(c), 33 and 34 of the Federal Rules of Criminal Procedure, and the government's response thereto, and defendant's reply and supplemental brief in support of post-verdict relief thereto, and the government's response thereto, and defendant's reply thereto. For the following reasons, the Court will deny defendant's Motions for Judgment of Acquittal and for Arrest of Judgment, and the Court will grant defendant's Motion for a New Trial.

### I. Introduction

The defendant, Leonard Patrick, D.V.M., was indicted by a grand jury on January 9, 1997 in a four count indictment. Dr. Patrick was charged with one count of conspiracy to commit mail fraud, in violation of 18 U.S.C. §§ 371, 1341, and three counts of making false statements to the grand jury, in violation of 18 U.S.C. § 1623.

Count I of the indictment alleged that from in or about April 1994 to September 1994 the defendant conspired with Robert Deo, an unindicted co-conspirator, to intentionally kill the racehorse Oblige, which was owned by Deo, for the purpose of collecting proceeds from an insurance contract. The

indictment alleged that defendant injected bacteria into the left knee joint of the racehorse in order to create an infection of the foreleg.

The indictment further alleged that defendant attempted to "frame" another veterinarian, Dr. Deborah Mood, and then urged Deo to file a false lawsuit against this veterinarian. Lastly, the indictment alleged that defendant instructed Deo to falsely state on an insurance claim form that the racehorse's death was attributed to the medical malpractice of a veterinarian other than defendant.

Counts II, III and IV of the indictment alleged that on or about September 7, 1995 defendant gave false statements while under oath in a proceeding before the federal grand jury of the United States District Court for the Eastern District of Pennsylvania. Count II focussed on certain questions and answers from the grand jury concerning whether defendant had discussions with Deo regarding the medical condition and career of Oblige. Count III dealt with questions and answers concerning whether defendant treated Oblige at any time after June 9, 1994. Count IV centered around questions and answers concerning whether defendant had contact with Deo after June 9, 1994.

A jury trial was scheduled to commence on February 19, 1997. Defendant was represented by Francis J. Hartman, Esquire. On February 13, 1997, the government filed a motion for a hearing regarding defense counsel's apparent conflict of interest. In the motion, the government stated that it intended to call Mood. The motion also stated that Charles H. Nugent, the partner of Hartman, formerly represented Mood in a civil lawsuit filed by Patrick against Mood and docketed as *Patrick v. Mood*, No. BUR–C–1926–89 in Burlington, New Jersey.[1]

This lawsuit alleged that Mood breached her employment contract with the defendant and performed veterinary services for them in violation of a non-competition clause. The government intended to introduce testimony that defendant was hostile to Mood and conspired to frame her for the death of Oblige.

The government also intended to present evidence that defendant conspired to have a medical malpractice lawsuit filed against Mood which falsely implicated her in Oblige's death. Defendant's bias and hostility toward Mood, according to the government, would be an issue relevant to motive, plan and intent. The government claimed that under these circumstances, Nugent's former representation of Mood created a conflict for Nugent as well as for his partner and former employer, Hartman.

Hartman filed a certification in response to the government's motion, in which he stated that (1) he had no knowledge of the prior civil case, (2) Nugent could not recall any information from that case, and (3) the office file for this civil case had been destroyed. Hartman stated that the criminal matter was not "substantially related" to the prior lawsuit and that "there is nothing to suggest that any information relative to the representation will be used to the disadvantage of the former client." Hartman further stated that the "interest of Dr. Patrick is to see that justice is done. Hopefully, that is the interest of Dr. Mood as well. Certainly, their interests are not materially adverse."

At a hearing on February 19, 1997, the Court heard testimony from Mood and Patrick. Mood stated that although she did not have any conversations with Hartman in the course of the lawsuit, she was aware that Nugent had spoken to Hartman regarding her case. She responded that she was not aware of any confidential information which she had related to Nugent which would bear upon the criminal case, and she stated that she did not know if Hartman had information on which he could cross-examine her.

Hartman stated at the hearing that he was unaware until a few weeks prior to the trial that his office had represented Mood and that he had been informed of that prior representation by the government. He stated that his office file of *Patrick v. Mood* had been destroyed. In addition, Hartman asserted that he had spoken to his partner,

---

1. At the time of his representation of Mood, Nugent was an employee of the law offices of Francis Hartman, Chartered.

Nugent, and asked him if he recalled the matter. Nugent responded that he did recall the matter and that he did not remember anything that "could conceivably be evidential" in the criminal matter. Nugent further informed Hartman that even if he could recall information about the case, he would not tell Hartman.

This Court then conducted a colloquy of the defendant in which the Court explained its responsibility to be certain that there were no actual or serious potential conflicts of interests that could emerge and arise in the course of the trial. The Court explained that a partner or co-shareholder "stands in the same shoes as the attorney himself" for purposes of a conflict as a general principle. Patrick stated that he did not know of any either actual or potential conflict of interest that existed on the part of counsel in connection with his representation of him. The Court informed Patrick that the government's motion alleged that bias and hostility toward Mood would be an issue relevant to defendant's motive, plan and intent in this case. When asked if he was aware that the government was alleging that his interests were materially adverse to the interests of Mood, and that the civil and criminal trials were substantially related, Patrick responded that he was aware.

During the course of this hearing, Mood and Patrick waived any potential conflict of interest that Hartman may have had. This Court concluded that defendant's waiver of his right to his attorney's undivided loyalty free of conflict should be permitted. This Court concluded that the conflict was "tenuous at best," in light of the fact that Nugent, not Hartman represented Mood, and that the civil case was six or seven years prior to the criminal trial. Moreover, Hartman noted that Nugent could not remember any confidential information about the case and had informed Hartman that he would not reveal to him any confidential information that he may possibly recall about the civil law suit.

On February 28, 1997, the jury found defendant Leonard Patrick guilty of conspiracy to commit mail fraud and two counts of false declarations before the federal grand jury. He was acquitted of one count of making a false declaration before a grand jury. Thereafter, Hartman was released as trial counsel, and defendant filed a timely *pro se* post-verdict motion. On March 13, 1997, defendant's successor counsel filed a motion for extension of time within which to file post-verdict motions and to submit a brief in support of the post-verdict motions; this motion was granted. Subsequently, defendant was granted another extension in which to file such motions. On June 2, 1997, defendant filed his post-verdict motions, seeking relief on the grounds of ineffective assistance of trial counsel, judgment of acquittal under Fed.R.Crim.P. 29, arrest of judgment under Fed.R.Crim.P. 34, and trial error pursuant to Rule 33. The government has filed a timely response. The Court will now consider defendant's argument *seriatim.*

## II. Rule 29 Motions for Judgment of Acquittal

### A. Rule 29 Standard

■ The district court shall order entry of judgment of acquittal "if the evidence is insufficient to sustain a conviction of such offense or offenses." Fed.R.Crim.P. 29(a). The standard to be applied by a trial court in deciding a motion for judgment of acquittal in a criminal case is "whether, after viewing the evidence in light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *United States v. Coleman,* 862 F.2d 455, 460–61 (3d Cir.1988).

■ The verdict must be sustained if there is substantial evidence, taking the view most favorable to the government, to support the verdict. *United States v. Aguilar,* 843 F.2d 155, 157 (3d Cir.1988). Thus, the evidence in the record must be examined as a whole and in the light most favorable to the government. *See United States v. Lowell,* 649 F.2d 950, 958 (3d Cir.1981). The government must be given the benefit of inferences that may be drawn from the evidence and the evidence may be considered probative even if it is circumstantial. *See United States v. Pecora,* 798 F.2d 614, 618 (3d Cir.1986). The

verdict will be overruled only if no reasonable fact finder could accept the evidence as sufficient to support the conclusion of the defendant's guilt beyond a reasonable doubt. *United States v. Leo,* 941 F.2d 181 (3d Cir. 1991).

### B. Sufficiency of the Evidence

Defendant's Rule 29 challenge will not detain this Court long. Although defendant has made a motion for judgment of acquittal for insufficiency of the evidence, he has failed to argue anywhere in his memorandum of law as to why the evidence at trial was insufficient to support his conviction. This argument was probably not made because it is without merit.

At pages two through eight of the government's response to defendant's request for post-verdict relief, the government summarizes the evidence offered at trial which would support the jury's verdict. An independent review of this evidence by the Court leads to the conclusion that the government produced sufficient evidence to support the jury's finding on each and every count.

■ Holding the evidence in a light most favorable to the government and drawing all inferences in their favor, the government's evidence would support the following facts. In approximately May and June 1994, Deo engaged in a series of conversations with Patrick about killing Oblige to collect the insurance money on the horse when the horse became lame and was no longer a profitable investment for Deo. Patrick assured Deo he had a quick and painless method to kill Oblige. The men devised a plan to cover up the deed by fabricating a claim of medical malpractice against Mood to make it appear as if that veterinarian caused the horse's death in the ordinary course of providing veterinary treatment.

The plan was for Deo to arrange for Oblige to receive veterinary treatment for its lameness. First, Deo transported Oblige to New Jersey to be examined by a veterinarian at Garden State Racetrack named Edward Devine. Devine confirmed the horse's lameness in the left foreleg and that it was not fit to race. He recommended that the horse be treated. Deo then arranged for Mood to perform an interarticular injection ("tapping") of Oblige's leg joints.

The plan was for Patrick to surreptitiously inject the horse with a lethal substance after Mood treated the horse, so it could be claimed that Oblige died as a result of an infection that developed because Mood did not properly "tap" the horse. As part of the "payment" for Patrick's help, Patrick wanted Deo to file a malpractice suit against Mood claiming that she caused the lethal injection that led to Oblige's death. Deo also agreed to use Patrick to provide veterinary services for any new horses purchased by Deo with the insurance money.

On June 14, 1994, at approximately 8:00 a.m., Oblige was tapped in the left foreleg by Mood. During this tapping procedure, Mood dropped the needle she was using to tap Oblige when Oblige made a sudden movement. After getting another sterile needle, Mood finished the tapping procedure. When Mood left Oblige, the horse was in good condition. Later that morning, Deo and Patrick were observed together at Oblige's stall by one of the trainers, Pamela Shavelson.

On June 15, at approximately 2:00 p.m., Oblige was discovered screaming and in distress in his stall at the racetrack barn. The horse was transported by emergency vehicle to the New Bolton Center, a veterinary hospital in Chester County. Oblige was admitted with a massive infection of the left knee joint, with inflammation, swelling and excruciating pain. Joint fluid removed from the knee was a dark brownish-red color. Lab results confirmed the presence of massive amounts of E.Coli, enterococcus, and other bacteria in the fluid. E.Coli and enterococcus bacteria are typically found in fecal matter. Despite efforts to save the animal, the horse's condition worsened and Oblige was euthanized on June 22, 1994.

Thereafter, on July 22, 1994 Deo mailed a "Proof of Loss and Authorization for Claim" with Lloyds Livestock Insurance Company to collect on the $75,000 equine mortality insurance policy he maintained on Oblige. After discussion with Patrick, Deo falsely represented on the claim form that Oblige's death was attributed to the malpractice of Mood

when she tapped the horse on the morning of June 14.

Pursuant to his agreement with Patrick, Deo retained the services of attorney Alan Pincus to pursue a medical malpractice suit against Mood, as well as the insurance claim for the $75,000 against Lloyds. However, as a result of the investigation and prosecution, the insurance claim was never paid to Deo and the malpractice suit was not pursued against Mood.

Based on the evidence that was admitted at trial, and holding the evidence in a light most favorable to the government and drawing all inferences in their favor, the Court finds that the government's evidence supports a conviction on Count I, conspiracy to commit mail fraud.

■ With respect to the two counts of making false declarations before a grand jury on which defendant was convicted, the Court also finds that the government offered sufficient evidence at trial to support the jury's verdict. On September 7, 1995, Patrick appeared as a witness before the grand jury and made statements under oath in responses to questions about the nature and extent of his relationship with Deo and his contacts with Oblige. Patrick testified that he treated Oblige at Deo's request on only one occasion, June 9, 1994, for exercise-related cramping and distress. Patrick was convicted of lying when he expressly denied having any discussions or contact with Deo about Oblige before June 9, 1994 (Count Two). Patrick was convicted of making false statements when he denied having any contact with Deo after that date, other than to inquire into its medical status at New Bolton, a few days after the horse's emergency admission of June 15, 1994 (Count Four). Holding the evidence in a light must favorable to the government, the Court finds that the jury's verdict as to both Counts Two and Four is supported by sufficient evidence. As such, the Court denies defendant's Rule 29 Motion.

### III. Rule 34 Motion for Arrest of Judgment

Rule 34 of the Federal Rules of Criminal Procedure provides, in relevant part, that "[t]he court on motion of a defendant shall arrest judgment if the indictment or information does not charge an offense or if the court was without jurisdiction of the offense charged." Fed.R.Crim.P. 34. In this case, none of these circumstances are present. Thus, the Court denies defendant's Rule 34 motion to arrest judgment. *See United States v. Whitted,* 454 F.2d 642, 646 (8th Cir.1972) (holding that a Rule 34 motion must be based upon failure of the indictment to charge an offense or upon a finding that the court was without jurisdiction of the offense).

### IV. Rule 33 Motions for a New Trial

#### A. Legal Standards under Rule 33

■ A district court may grant a defense motion for a new trial, "if required in the interests of justice." Fed. R. Crim. P. 33. The decision whether or not to grant a motion for a new trial is within the sound discretion of the trial court. *United States v. Martinez,* 763 F.2d 1297, 1312 (11th Cir. 1985).

■ " 'A motion for a new trial is addressed to the trial judge's discretion....' " *United States v. Console,* 13 F.3d 641, 665 (3d Cir.1993) (quoting *Government of the Virgin Islands v. Lima,* 774 F.2d 1245, 1250 (3d Cir.1985)). "A motion for a new trial is not favored and is viewed with great caution." *United States v. Miller,* 987 F.2d 1462, 1466 (10th Cir.1993). This power should only be exercised sparingly. *United States v. Bertoli,* 854 F.Supp. 975 (D.N.J. 1994).

■ A new trial should be granted only where there is a reasonable probability that the trial error could have had a substantial impact on the jury's decision. *Government of Virgin Islands v. Bedford,* 671 F.2d 758, 762 (3d Cir.1982). "The court has discretion in passing on the motion, but it should hold in mind the harmless error provisions of Rule 52, and refuse to grant a new trial if the substantial rights of the defendant were not affected." 2 Charles A. Wright, *Federal Practice and Procedure: Criminal 2d,* § 551 (1982 & Supp.1995).

■ Unlike motions for acquittal, in a motion for new trial the court need not view the evidence in the light most favorable to the government. Instead, the court must weigh evidence and consider the credibility of witnesses. *See Martinez,* 763 F.2d at 1312. The Eighth Circuit has explained that when considering a motion for a new trial:

> [t]he district court need not view the evidence in the light most favorable to the verdict; it may weigh the evidence and in so doing evaluate for itself the credibility of the witnesses. If the court concludes that, despite the abstract sufficiency of the evidence to sustain the verdict, the evidence preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred, it may set aside the verdict, grant a new trial, and submit the issues for determination by another jury.

*United States v. Lincoln,* 630 F.2d 1313, 1319 (8th Cir.1980). In making its Rule 33 inquiry, courts should always assess the weight of the evidence consistent with human experience.

### B. Weight of the Evidence

After reviewing the evidence at trial and assessing the credibility of the witnesses, the Court concludes that the weight of the evidence admitted at trial would support the jury's verdict. Although this case is not free from all ambiguities, as many cases are not, the Court simply cannot find that the evidence preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred. Thus, the Court rejects the defendant's general argument that the verdict was against the weight of the evidence.

### C. Defendant's Sixth Amendment Right to the Effective Assistance of Counsel

In his post-trial motions, defendant primarily argues that he was denied his Sixth Amendment right to effective assistance of counsel; and in support of this claim, defendant sets forth numerous specific instances of conduct by his counsel which allegedly sup-ports his ineffective assistance of counsel claim. The government contends that the issue of ineffective assistance of counsel is properly brought in collateral attack rather than via direct appeal. Thus, the government asks this Court not to consider defendant's claim of ineffective assistance of counsel on direct review.

In *United States v. Cocivera,* 104 F.3d 566 (3d Cir.1996), the United States Court of Appeals for the Third Circuit stated that it "has long followed the practice of declining to consider a defendant's claim of ineffective assistance of counsel on direct appeal." *Id.* at 570. Indeed, the Court noted that "the issue is usually more appropriate for collateral attack." *Id.* (citing *Government of the Virgin Islands v. Forte,* 806 F.2d 73, 77 (3d Cir.1986)). The reasons for not reviewing ineffective assistance of counsel claims on direct review is that (1) it cannot be logically expected that the attorney who represented defendant at trial will forcefully argue his client's ineffective assistance of counsel claim on appeal and (2) because these types of claims often require the reviewing court to consider matters outside the record, the matter should be considered by the district court in the first instance. *United States v. DeRewal,* 10 F.3d 100, 103 (3d Cir.1993).

■ In addition, the Third Circuit has stated that "[t]he rationale underlying these cases is that an evidentiary hearing must be conducted to establish whether counsel's performance was or was not up to the competency standard espoused in *Moore v. United States,* 432 F.2d 730 (3d Cir.1970)." *Government of Virgin Islands v. Zepp,* 748 F.2d 125, 133 (3d Cir.1984). Applying this rationale to the instant case, the Court finds that it would be improper for it to consider defendant's ineffective assistance of counsel claims at this stage. In order to establish a complete record for direct appeal, lengthy evidentiary proceedings would have to be held, extensive examination of witnesses would have to be conducted and a full review of the extrinsic evidence would have to be undertaken.[2] It is this type of case—one where

---

**2.** It should be noted that defendant does not argue that evidentiary hearings would not have to be held in this case. Rather, defendant contends that this Court would only have to hold one

evidentiary hearings would have to be held—wherein the defendant must file a § 2255 motion if he wishes to raise an ineffective assistance of counsel claim.

 In some cases, albeit rare, a sufficient record will exist to decide the issue without the necessity for an evidentiary hearing. *Cocivera*, 104 F.3d at 570–71. For example, where the facts regarding conflict of interest are clear on the record, the Court may address the defendant's ineffective assistance of counsel claim. *Zepp*, 748 F.2d at 133. In addition, the Court can consider defendant's claim when the attorney failed to raise a sentencing adjustment. *United States v. Headley*, 923 F.2d 1079 (3d Cir. 1991). Courts can also consider an ineffective assistance of counsel claim where the court held a hearing during the course of the trial to decide the issue of counsel's continuing representation and ineffectiveness. *Cocivera*, 104 F.3d at 571. In this case, none of these circumstances apply. Thus, the Court will not consider defendant's ineffective assistance of counsel claims.

### D. Defendant's Sixth Amendment Right to Conflict Free Counsel

Defendant Patrick also claims that he is entitled to a new trial because his Sixth Amendment right to conflict-free counsel was violated. Patrick claims that this right was violated in at least two ways. He first argues that his waiver of his right to conflict-free counsel was not knowingly, intelligently and voluntarily made in that certain information and documents that were available at the time of trial were not disclosed to the Court prior to or during defendant's waiver hearing, were not turned over to defendant by the government and were not obtained by defendant's counsel. Defendant claims that he would have never waived his right to conflict-free counsel if he had these documents. Defendant also argues that this Court would not have accepted defendant's waiver if the Court was provided with all of

this information. The government rejoins that defendants' waiver was done voluntarily, knowingly and willingly and that the Court properly accepted his waiver.

 The Third Circuit has noted that the "Sixth Amendment guarantee of effective assistance of counsel includes two correlative rights, the right to adequate representation by an attorney of reasonable competence and the right to the attorney's undivided loyalty free of conflict of interest." *United States v. Gambino*, 864 F.2d 1064, 1069 (3d Cir.1988) (citing *Zepp*, 748 F.2d at 131). "The attorney's undivided loyalty is required because the type of effective 'assistance of counsel' the Sixth Amendment guarantees a criminal defendant is that which puts the government to its proofs in adversarial manner, and for this counsel free of conflicts of interest is necessary." *United States v. Moscony*, 927 F.2d 742, 748 (3d Cir.1991) (citing *United States v. Cronic*, 466 U.S. 648, 656 n. 15, 661 n. 28, 104 S.Ct. 2039, 2045 n. 15, 2048 n. 28, 80 L.Ed.2d 657 (1984)). Patrick, thus, as a criminal defendant clearly had the right to conflict-free representation.

 This right to conflict-free representation, however, is not the only right that emanates from the Sixth Amendment. The right to effective assistance of counsel also assures that "a defendant should be afforded a fair opportunity to secure counsel of his own choice." *Powell v. Alabama*, 287 U.S. 45, 53, 53 S.Ct. 55, 58, 77 L.Ed. 158 (1932). "The view is that a primary purpose of the Sixth Amendment is to grant a criminal defendant control over the conduct of his defense—as 'it is he who suffers the consequences if the defense fails,' *Faretta v. California*, 422 U.S. 806, 820, 95 S.Ct. 2525, 2533, 45 L.Ed.2d 562 (1975)—and '[a]n obviously critical aspect of making a defense is choosing a person to serve as an assistant and representative.'" *Moscony*, 927 F.2d at 748 (*Wheat v. United States*, 486 U.S. 153, 166, 108 S.Ct. 1692, 1700, 100 L.Ed.2d 140

hearing, which would take no longer than one day. However, defendant's claim that the hearing would only take one day is based on mere conjecture. The Court, as well as the parties, cannot state with any certainty that an evidentiary hearing in this case would only last one day;

indeed, the hearing(s) could plausibly take much longer, and under this scenario, the Court would be conducting the lengthy evidentiary hearings that it should not conduct in the post-verdict motion context.

(1988)). Therefore, "a presumptive right to the counsel of one's choice has been recognized as arising out of the Sixth Amendment, ... and, unless this presumption" was somehow overcome, Patrick had the right to have Hartman represent him.

As was noted in *Moscony*, other "right[s]" enter into the court's "calculus" when considering a case in which the defendant's Sixth Amendment right to conflict-free representation may be implicated. *Id.* These other "rights" spring not from the Sixth Amendment but rather from "the ethical precepts that govern the legal profession...." *Id.* In this case, the following "rights" were implicated. A client has a right not to have her communications with her attorney revealed.[3] In addition, a lawyer cannot "represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client consents after a full disclosure of the circumstances and consultation...." Pa. R. Professional Conduct 1.9(a). Taking Rule 1.9 one step further to ensure that conflicts of interest are not involved in any case, Rule 1.10 of the Pennsylvania Rules of Professional Conduct states that "[w]hile lawyers are associated in a firm, none of them shall knowingly represent a client when one of them practicing alone would be prohibited from doing so by Rules 1.7, 1.8(c), 1.9 or 2.2." Pa. R. Professional Conduct 1.10.

As noted by the *Moscony* court, the "unenviable duty of reconciling these various rights and duties—*i.e.,* [Patrick's rights to conflict-free representation of counsel, and to have Hartman as his counsel; the right of Mood not to have Hartman reveal any confidential information; and the duty of Hartman not to work against the interests of his associate's former client, and to not reveal, to her disadvantage, information relating to his associate's prior representation of her]—devolve[s] upon the district court." *Id.* at 749.

"Usually, the various rights and duties of the attorney clash when a defendant seeks to waive his right to conflict-free representation in circumstances in which the counsel of choice may have divided loyalties due to concurrent or prior representation of another client who is a co-defendant, co-conspirator, or a government witness." *Id.* However, a waiver does not extract the district court from its unenviable task of balancing all of the rights and duties implicated because "the trial court has an institutional interest in protecting the truth-seeking function of the proceedings over which it is presiding by considering whether the defendant has effective assistance of counsel." *Id.* In addition:

> to protect the critically important candor that must exist between client and attorney, and to engender respect for the court in general, the trial court may enforce the ethical rules governing the legal profession with respect both to client-attorney communications and to conflict-free representation, again regardless of any purported waiver.

*Id.* Finally, the district court should independently assess whether the waiver should be accepted because it has an interest in protecting a "fairly-rendered verdict from trial tactics that may be designed to generate issues in appeal." *Id.* This question—whether the court should accept a defendant's waiver—is vested in the sound discretion of the trial court, and the trial court is given "substantial latitude" in determining whether to disqualify an attorney. *Id.* at 750.

In this case, before the start of the trial, the government filed a motion for a hearing regarding defense counsel's apparent conflict of interest. In the motion, the government stated that it intended to call Mood. The motion also stated that Nugent, the partner of Hartman, formerly represented Mood in a

---

3. The rule provides, in part: "A lawyer shall not reveal information relating to representation of a client unless the client consents after consultation...." Pa. R. Professional Conduct 1.6(a). And "[t]he duty not to reveal information relating to representation of a client continues after the client-lawyer relationship has terminated." *Id.*

Rule 1.6(d); *see also* Local R. Civ. P. 83.6 (Rule IV(B)) (adopting Pennsylvania's Rules of Professional Conduct for use in the Eastern District of Pennsylvania); Local R.Crim. P. 2 (making Local Civil Rule 83.6 fully applicable in all criminal proceedings).

civil lawsuit filed by Patrick against Mood and docketed as *Patrick v. Mood,* No. BUR–C–1926–89 in Burlington, New Jersey.

This lawsuit alleged that Mood breached her employment contract with the defendant and performed veterinary services for them in violation of a non-competition clause. The government intended to introduce testimony that defendant was hostile to Mood and conspired to frame her for the death of Oblige. The government also intended to present evidence that defendant conspired to have a medical malpractice lawsuit filed against Mood which falsely implicated her in Oblige's death. Defendant's bias and hostility toward Mood, according to the government, would be an issue relevant to Patrick's motive, plan and intent in the instant case. The government claimed that under these circumstances, Nugent's former representation of Mood created a conflict for Nugent as well as for his partner and former émployer, Hartman.[4]

Hartman filed a certification in response to the government's motion, in which he stated that (1) he had no knowledge of the prior civil case, (2) Nugent could not recall any information from that case, and (3) the office file for this civil case had been destroyed. Hartman stated that the criminal matter was not "substantially related" to the prior lawsuit and that "there is nothing to suggest that any information relative to the representation will be used to the disadvantage of the former client." Hartman further stated that the "interest of Dr. Patrick is to see that justice is done. Hopefully, that is the interest of Dr. Mood as well. Certainly, their interests are not materially adverse."

At a hearing on February 19, 1997, the Court heard testimony from Mood and Patrick. Mood stated that although she did not have any conversations with Hartman in the course of the lawsuit, she was aware that Nugent had spoken to Hartman regarding

---

**4.** The government's contention at the conflict hearing, and now defendant's contention in this motion, is that Nugent would have had a conflict of interest as defined under Rule 1.9 if he represented Patrick at trial. As such, the government contended, and now defendant contends, that under Rule 1.10, Hartman had the same conflict of interest because he was associated with Nugent at the time of the trial. *See* Pa. R. Professional Conduct 1.10.

While this Court assumed, for the purposes of deciding this issue at the conflict hearing, that Hartman's representation of Patrick created a conflict of interest, the issue as to whether a conflict of interest actually existed is not as clear as defendant would have this Court believe. Indeed, the cases in which conflicts of interest usually arise almost exclusively concern a situation where an attorney is required to cross-examine a former client who that attorney once represented. In this case, Hartman did not actually represent Mood, the former client; instead, it was Hartman's associate who represented Mood in the civil case. Thus, this case deals with a conflict of interest by imputation, and, although an imputed conflict may be a difference without a distinction when you are dealing with the enforcement of the Rules of Professional Conduct in an attorney disciplinary action, this Court believes that such a difference does distinguish this case from the usual conflict of interest cases.

In criminal cases, the Sixth Amendment provides the defendant with a right to an attorney with undivided loyalties, *i.e.,* no conflicts of interest. This right exists to assure that the government is put to its proofs in an adversarial manner, that is, the government is required to prove the defendant guilty beyond a reasonable doubt

in the face of a vigorous defense. The right to conflict-free representation assumes that defense counsel cannot put on a vigorous defense if he or she has a conflict of interest, that is why the presumption of one's right to counsel of your own choice is overcome by a showing of an actual conflict of interest or a serious potential conflict of interest. However, where there is no actual conflict of interest, there simply cannot be a violation of the defendant's Sixth Amendment right to the effective assistance of counsel because there is no chance that defendant's defense could be jeopardized by an attorney who could not fully defend his client due to a conflict of interest.

Thus, even though Nugent's conflict of interest is required to be imputed to Hartman under the Rules of Professional Conduct, this finding does not necessarily mean that Hartman had an actual conflict of interest which violated Patrick's Sixth Amendment right to conflict-free counsel. Indeed, in order to show that this right has been violated, Patrick would have to show that there was an *actual conflict* and that it adversely affected his lawyer's conduct. *Cuyler v. Sullivan,* 446 U.S. 335, 350, 100 S.Ct. 1708, 1719, 64 L.Ed.2d 333 (1980). Based on the record of this case, the Court finds that Patrick would be hard pressed to prove that Hartman was laboring under an actual conflict of interest at trial and that this conflict of interest adversely affected his conduct at trial. Admittedly, the Court finds that no evidence exists in the record of this case that would indicate an actual conflict adversely affected Hartman's conduct during the course of his representation of Patrick.

her case. She responded that she was not aware of any confidential information which she had related to Nugent which would bear upon the criminal case, and she stated that she did not know if Hartman had information on which he could cross-examine her.

Hartman stated at the hearing that he was unaware until a few weeks prior to the trial that his office had represented Mood and that he had been informed of that prior representation by the government. He stated that his office file of *Patrick v. Mood* had been destroyed. In addition, Hartman asserted that he had spoke to his partner, Nugent, and asked him if he recalled the matter. Nugent responded that he did recall the matter and that he did not remember anything that "could conceivably be evidential" in the criminal matter. Nugent further informed Hartman that even if he could recall information about the case, he would not tell him.

This Court then conducted a colloquy of the defendant in which the Court explained its responsibility to be certain that there were no actual or serious potential conflicts of interests that could emerge and arise in the course of the trial. It was explained to Patrick that Mood was going to be called by the government as a witness, and that his trial counsel would have the right to cross-examine her. The Court informed Patrick that a partner or co-shareholder "stands in the same shoes as the attorney himself" for purposes of conflict as a general principle; the implication being that any conflict that Nugent may have had would be imputed to Hartman. The Court also raised the possibility that if trial counsel had any knowledge that he may have obtained from Mood, this may have a bearing on this case. The Court informed Patrick that the government's motion alleged bias and hostility toward Mood which would be an issue relevant to defendant's motive, plan and intent in this case.

Patrick stated that he did not know of any either actual or potential conflict of interest that existed on the part of counsel in connection with his representation of him. When asked by the Court if he was aware that the government was alleging that his interests were materially adverse to the interests of Mood, and that the civil and criminal trial were substantially related, Patrick responded that he was aware. In sum, Patrick assured the Court that none of the issues raised by the government in its motion and addressed by the Court in the colloquy changed his desire to proceed to trial with Hartman.

During the course of this hearing, Mood and Patrick waived any potential conflict of interest that Hartman may have had. This Court concluded that defendant's waiver of his right to his attorney's undivided loyalty free of conflict should be permitted. It was found that the conflict was "tenuous at best," in light of the fact that Nugent, not Hartman represented Mood, and that the civil case was six or seven years prior to the criminal trial. Moreover, Hartman noted that Nugent could not remember any confidential information about the case and had informed him that he would not reveal confidential information. Because Hartman did not have any knowledge about the prior case, there simply was no possibility that Patrick's defense would be jeopardized by Hartman's representation. Thus, the Court accepted Patrick's waiver.

 Defendant presently argues that his Sixth Amendment right to conflict-free representation was violated at trial. The Court first notes that defendant does not argue that this Court improperly accepted his waiver in the first instance. Indeed, under the circumstances as described above, any such argument by counsel would be without merit. Instead, defendant argues that his waiver was not knowingly, intelligently, and voluntarily made in that certain information and documents that were available at the time of trial were not disclosed to the Court prior to or during defendant's waiver hearing, were not turned over to defendant by the Government, and were not obtained by defendant's counsel. Defendant argues, that had these documents and information been made known to him, he would not have waived his right to conflict-free counsel and/or the Court would not have accepted his waiver. The Court finds defendant's argument to be specious.

In advancing his argument, defendant refers to the contents of certain records in the

government's possession arising from the civil suit, namely correspondence between Mood and her attorney, and the contents of files maintained by his own attorney, Betsy Liebman, in the civil suit. The defendant asserts that these documents could have been used to further impeach Mood's testimony, and were critical to his defense. In essence, defendant argues that he would not have waived his right to conflict-free representation if he had these documents because he would have been alerted to the truly hostile nature of the civil suit. Thus, defendant claims that his waiver was not knowingly, intelligently and voluntarily made because he did not possess this information at the time of the waiver.[5]

The Court finds that defendant's argument misses the mark. The documents—that defendant contends that the government failed to produce and that his trial counsel failed to request—highlight the contentious nature of the underlying civil litigation between Patrick and Mood. These documents, however, do not support defendant's claim that he

would not have waived his Sixth Amendment right to conflict-free representation if he had knowledge of the contents of these documents.[6]

 For a trial judge to find that a waiver is knowing and intelligent, the court must be satisfied that the defendant is aware of the foreseeable prejudices his attorney's continued representation could entail for his trial and the possible detrimental consequences of those prejudices. *United States v. Dolan*, 570 F.2d 1177, 1181 (3d Cir.1978). In this case, the Court finds that Patrick was well aware of the foreseeable prejudices his attorney's continued representation could entail for his trial and the possible detrimental consequences of those prejudices. The Court made the defendant fully aware of the potential conflict of interest and that this conflict may have a bearing on his trial. The defendant was well aware of the nature and extent of the civil law suit, the ensuing negotiations between the parties in the civil law suit, and the adversarial positions taken by

**5.** In his brief, defendant sets forth additional reasons in support of his waiver argument that are wholly unrelated to the contents of the documents. Defendant also argues that his waiver was not made knowingly, intelligently and voluntarily because he was not advised of the government's motion until the morning of the hearing, he never received a copy of the motion and he was never given the opportunity to consult independent counsel. All of these arguments are without merit.

To begin, although Patrick may not have been advised of the government's motion until the morning of the hearing and never saw the motion, this Court explained to Patrick, in open court during his colloquy, the allegations contained in the government's motion. Thus, Patrick was fully advised of and aware of the issues raised by the government in its motion. Patrick also fails to cite any legal authority to support his claim that he was entitled to consult with independent counsel before waiving his Sixth Amendment right to conflict-free counsel.

Finally, although Patrick may have never received the government's motion or had knowledge of the hearing until the morning of the hearing, Patrick knew about the underlying conflict of interest issue as early as February 7, 1997. Indeed, Patrick, in his affidavit, states that on February 7, 1997:

I met with Mr. Hartman in his office regarding my criminal trial. He advised me that the Government had told him that in 1989 and 1990 Mr. Hartman's firm, then known as Fran-

cis J. Hartman, Chartered, had represented Dr. Debra Mood in the prior civil lawsuit filed by me. Mr. Hartman advised me that he may have to withdraw as my attorney as a result of his firm's prior representation of Dr. Mood, but that he would file papers with the court to attempt to remain as counsel. This meeting with Mr. Hartman was of a very short duration.

(Def.'s Post–Verdict Mots. Ex. 1 ¶ 5). Thus, although Patrick may not have known about the government's motion, Patrick knew about the underlying conflict issue, which supports a finding that Patrick's waiver was knowingly, voluntarily and intelligently made. Patrick cannot feign a lack of knowledge of the conflict of interest issue because his affidavit belies this position.

**6.** Defendant, in response to the government's contention that he has never articulated why he would not have wanted trial counsel to represent him had he known of the contents of the government's and Liebman's files, has stated: "Would a defendant want a firm to represent him that had previously threatened to disclose unsubstantiated claims of illegal activities regarding his veterinarian practice, had pressured and attempted to strong-arm him into settling a civil matter based upon Dr. Mood's admitted breach of her employment contract, and had planted the first seed of steroid allegations in the mind of the Government's witness, Dr. Mood?" (Def.'s Reply Br. & Supplemental Br. Supp. Post–Verdict Relief at 5).

the parties in the civil law suit because he was a direct participant in the process. When this Court asked Patrick whether he was aware that the interests were materially adverse, his reply—that he was aware—was made with knowledge and was intelligently rendered. Thus, the Court finds that defendant's waiver was made knowingly, intelligently and voluntarily.

To the extent that defendant may not have had specific knowledge of some of the information which was in the documents, the Court finds that this lack of specific knowledge is irrelevant for the purposes of his waiver. When defendant made his waiver, he had been fully informed that there existed a potential conflict of interest. Thus, defendant knew that his defense could be adversely effected by this conflict. The fact that he may not have had knowledge of the contents of the documents, that demonstrated that the underlying civil litigation was more hostile than he perceived it to be, does not impact whether he validly waived his right to conflict-free representation because the conflict of interest at issue would still have been the same no matter how hostile the underlying litigation was. The conflict of interest at issue was that Hartman may be unable to or unwilling to vigorously cross-examine Mood due to his associate's prior representation of Mood. This conflict of interest issue thus arose not because of the hostility of the underlying litigation, but because of the very fact of the underlying litigation itself. Thus, as long as Patrick had knowledge of the underlying litigation, he could make a knowing, voluntary and intelligent waiver of his Sixth Amendment right, which he did.

■ The Court also rejects defendant's argument that this Court could not properly inform defendant of the ramifications of his waiver or properly accept the waiver because the Court did not have these documents. In order to properly inform the defendant about the perils of waiver, "the Court should seek to elicit a narrative response from each defendant that he has been advised of his right to effective representation, that he understands the details of his attorney's possible conflict and the potential perils of such a conflict, that he has discussed the matter with his attorney or if he wishes outside counsel, and that he voluntarily waives his Sixth Amendment protections." *Id.* (quoting *United States v. Garcia,* 517 F.2d 272, 278 (5 Cir.1975)). As described above, the Court did properly advise Patrick of Hartman's possible conflict and the potential perils of such a conflict.

■ The law is also clear that the test of an informed waiver is not whether the trial judge told the defendant everything, but "whether the defendant knew enough to make the choice an informed one—a rational realization of risks and gains that are in the main understood." *United States v. Roth,* 860 F.2d 1382, 1389 (7th Cir.1988). Although it is true that this Court did not have all of the documents related to the conflict, the defendant knew enough about the conflict of interest to make the choice an informed one, *i.e.,* a rational realization of risks and gains that were understood. The defendant was fully informed of the factual and legal issues pertaining to attorney Nugent's representation of Mood. The defendant had significant knowledge of the civil law suit in which he was a direct participant, and was aware that the issue of bias stemming from the parties' relationship would arise at trial. Under these circumstances, Patrick made a rational choice to proceed with Hartman's representation despite his associate's prior professional relationship with Mood. Therefore, the Court rejects the argument that it could not have properly informed Patrick of the perils of conflict or properly accepted Patrick's waiver because it did not have all of the documents.

### E. Brady/Giglio Error

Defendant contends that the government engaged in prosecutorial misconduct by failing to disclose the records of the attorney-client communications between Mood and Nugent. The defendant maintains that this constituted a violation of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) and that he should be awarded a new trial. The government argues that defendant's claim is without merit because (1) defendant did not request these records and (2) the undisclosed records do not satisfy the

standard of materiality to establish a *Brady* violation.

■ The *Brady* doctrine requires the government to volunteer "evidence favorable to an accused on request ... where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87, 83 S.Ct. at 1196–97. *See also United States v. Agurs,* 427 U.S. 97, 110, 96 S.Ct. 2392, 2400, 49 L.Ed.2d 342 (1976); *United States v. Hill,* 976 F.2d 132, 134 (3d Cir.1992). "Materials that must be disclosed are those that go to the heart of the defendant's guilt or innocence and materials that might affect the jury's judgment of the credibility of a crucial prosecution witness." *Id.* at 134–35 (citing *Giglio v. United States,* 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972); *United States v. Higgs,* 713 F.2d 39 (3d Cir.1983), *cert. denied,* 464 U.S. 1048, 104 S.Ct. 725, 79 L.Ed.2d 185 (1984)). The government's failure to disclose *Brady* or *Giglio* evidence, if that evidence is deemed material, constitutes a denial of due process and grounds for a new trial. *Giglio,* 405 U.S. at 154, 92 S.Ct. at 766. The standard of materiality that applies to the government's non-production of alleged *Brady* and *Giglio* depends upon the particular circumstances of the case. *See Agurs,* 427 U.S. at 112, 96 S.Ct. at 2401–02; *United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985) (plurality opinion).

In *Agurs,* the Supreme Court noted that *Brady* applied in three different types of cases. The first category concerns those cases in which the "undisclosed evidence reveals the use of perjured testimony and the prosecutor either has knowledge, or should have knowledge, of the use of such testimony." 25 *Moore's Federal Practice,* § 616.06[1], at 616–62 (Matthew Bender 3d ed. 1997). In this type of case, the Court held that the applicable standard of materiality is whether "there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Agurs,* 427 U.S. at 103, 96 S.Ct. at 2397. This standard is not applicable to the facts of this case because defendant does not argue that the government had knowledge of, or should

have had knowledge, of the use of perjured testimony.

The second type of case deals with cases in "which a pretrial request has been made for discovery of specific evidence." 25 *Moore's Federal Practice,* § 616.06[1], at 616–63. With respect to this type of case, the Supreme Court stated, although in an ambiguous manner, that failure to respond to a specific request is "seldom, if ever, excusable." *Agurs,* 427 U.S. at 106, 96 S.Ct. at 2399. This standard is also not applicable to the facts of this case because the defendant never made a specific request for the documents at issue here.

The third type of case that *Agurs* addresses is "whether the prosecution has a duty to provide the defense with exculpatory information in cases involving broad or general *Brady* requests, or no discovery requests at all." 25 *Moore's Federal Practice,* § 616.06[1], at 616–63. "The Court determined that these two types of cases should be treated together, reasoning that since a prosecutor's duty to respond to a general request for *Brady* material depended on the 'obviously exculpatory character' of the evidence in question, 'if the evidence is so clearly supportive of a claim of innocence that it gives the prosecution notice of a duty to produce, that duty should equally arise even if no request is made.'" *Id.* (quoting *Agurs,* 427 U.S. at 107, 96 S.Ct. at 2399). In articulating the standard of materiality for these types of cases, "the Court focused on the notice to the prosecution of a duty to produce, as well as the defendant's due process rights to a fair trial." *Id.* The Supreme Court concluded that in cases where there has been only a general request or no request at all, "if the omitted evidence creates a reasonable doubt that did not otherwise exist constitutional error has been committed." *Agurs,* 427 U.S. at 112, 96 S.Ct. at 2402.

■ For the purposes of this case, the standard of materiality that has been articulated for the third type of cases discussed in *Agurs*—where there has been only a general request or no request at all—is fully applicable here. Defendant Patrick does not maintain that he made a specific or general re-

quest; instead, Patrick candidly admits that there was no request made by his attorney.[7] However, relying on *Agurs*, Patrick argues that it is irrelevant that he did not make a request for these documents. As can be readily deduced from the above discussion of *Agurs*, Patrick is correct in advancing this argument, and vice versa, the government is patently wrong to suggest that Patrick cannot maintain a *Brady/Giglio* claim based on the fact that Patrick did not make a specific request for the undisclosed documents. As stated above, a criminal defendant can support a *Brady* claim even in the absence of a specific request by the defendant; in this type of case, "if the omitted evidence creates a reasonable doubt that did not otherwise exist constitutional error has been committed." 427 U.S. at 112, 96 S.Ct. at 2402. Thus, the question posited at this point is whether Patrick can establish a *Brady* violation under the standard for "no request" cases.

However, before this standard is applied to the facts of this case, the Court must set forth the Supreme Court's refinement of this standard as articulated in *Bagley*. In *Bagley*, the Supreme Court first restated the requirement of prosecutorial disclosure "only of evidence that is both favorable to the accused and 'material either to guilt or punishment,'" and concurred with the analysis in *Agurs* that *Brady*'s materiality standard implied "a concern that the suppressed evidence might have affected the outcome of the trial." *Bagley*, 473 U.S. at 674, 105 S.Ct. at 3379. With respect to *Giglio* impeachment evidence, the Supreme Court explicitly rejected the Ninth Circuit's conclusion that the non-disclosure of impeachment evidence was of greater concern than the suppression of exculpatory evidence. *Id.* at 676, 105 S.Ct. at 3380. The Court held that the government's failure to assist the defense by disclosing information that might have been helpful in conducting the cross-examination of prosecution witnesses only "amounts to a constitutional violation ... if it deprives the defendant of a fair trial." *Id.* at 678, 105 S.Ct. at 3381–82. "Consistent with [the] overriding concern with the justice of the finding of guilt, a constitutional error occurs, and the conviction must be reversed, only if the evidence is *material* in the sense that its suppression undermines confidence in the outcome of the trial." *Id.* (internal quotations and citation omitted) (emphasis added).

The Supreme Court then attempted to redefine the standard of materiality for determining whether the nondisclosure of *Brady* evidence constitutes error in cases where there has been no request or only a general request for evidence and where there has been a specific request for evidence. 25 *Moore's Federal Practice*, 616.06[1], at 616–65. To begin, the Court abandoned the distinction between "specific request" cases and "general- or no-request" cases. *Kyles v. Whitley*, 514 U.S. 419, 432, 115 S.Ct. 1555, 1565, 131 L.Ed.2d 490, 505 (1995) (citing *Bagley, supra*). Despite the fact that a majority was not achieved, five of the Justices in two separate opinions adopted the following standard of materiality in "specific request" and "general- or no-request" cases: "evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley*, 473 U.S. at 683, 105 S.Ct. at 3383 (plurality opinion of Blackmun, J.); 473 U.S. at 685, 105 S.Ct. at 3385 (concurring opinion of White, J.).

In *Kyles*, the Supreme Court reaffirmed the standard of materiality as it had articulated it in *Bagley*. 514 U.S. at 432, 115 S.Ct. at 1565, 131 L.Ed.2d at 505. Thus, "evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.* (citations omitted). "A 'reasonable probability' of a different result is accordingly shown when the Government's evidentiary suppression 'undermines confidence in the outcome of the trial.'" *Id.*, 514 U.S. at 419, 115 S.Ct. at 1555, 131 L.Ed.2d at 506 (citing *Bagley*, 473 U.S. at 678, 105 S.Ct. at 3381). Thus, it is this standard of materiality that must be applied to the facts of this case to

---

7. Patrick actually advances an ineffective assistance of counsel claim based on his counsel's failure to request from the government and/or independently seek out these documents.

determine whether Patrick has established a *Brady* violation which would require a new trial.[8] As will be discussed *infra,* a review of the undisclosed evidence indicates that there does exist a reasonable probability that the outcome of Patrick's trial would have been different if the government produced the evidence in its possession to the defense.

■ Before the Court discusses why the undisclosed evidence in this case is material, the Court must first address an issue which was implicitly raised by the government. Although the government does not cite any case law to support its position, the government argues generically that Patrick cannot set forth a valid *Brady* claim because Patrick had access to the documents that form the basis for his *Brady* claim. The government's implicit argument arises out a line of cases in the Third Circuit that generally hold that "[i]t is true that *Brady* does not oblige the government to provide defendants with evidence that they could obtain from other sources by exercising reasonable diligence." *United States v. Perdomo,* 929 F.2d 967 (3d Cir.1991) (citation omitted). Indeed, "[e]vidence is not considered to be suppressed if the defendant either knew or should have known of the essential facts permitting him to take advantage of any exculpatory evidence." *Id.* (citations omitted). Thus, in light of this case law, the question before this Court is whether Patrick could have obtained the undisclosed documents with the exercise of reasonable diligence.

■ In this case, the Court finds that Patrick could not have obtained these documents through the exercise of reasonable diligence.[9] To begin, the government does not at all argue that Patrick knew of or should have known of the essential facts that would have permitted him to take advantage of any impeachment material. Although the government refers to certain documents in its motion for a hearing based on an apparent conflict of interest, the government never specifically identified the information that was contained in these documents; thus it is impossible to conclude that Patrick should have known of or had knowledge of the essential facts that would have permitted him to make use of these documents.

Additionally, Patrick did not learn of the existence of the government's motion until the day his trial commenced. Thus, even if Patrick had knowledge of the essential facts that would have permitted him to learn of the potential existence of documents that might be used to cross-examine Mood, a substantial question exists as to whether Patrick could have obtained all of the documents in a prompt fashion so that his counsel could have made effective use of them at trial. Indeed, Patrick asserts in his affidavit that Hartman and himself were engaged in intensive preparation for trial at the time the government gave Patrick's attorney notice of the motion. Thus, there is some question as to whether Patrick and his counsel would have even had the time to retrieve and make effective use of the documents at the trial.

Although the government argues that Patrick could have easily obtained the undisclosed documents because it had the documents in the courtroom on the day of the hearing and all that Patrick had to do was, in essence, walk over and ask for them, the Court finds that Patrick should not be foreclosed from arguing that there was a *Brady* violation because a holding to this effect

---

8. The Supreme Court has also emphasized other aspects of materiality under *Bagley* which bear mentioning before this Court determines whether there was a *Brady* violation in this case. First, the *Bagley* materiality standard is not a preponderance of the evidence test, that is, the "defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would have not been enough left to convict." 514 U.S. at 419, 115 S.Ct. at 1555, 131 L.Ed.2d at 506. Second, once this court has determined that there has been a constitutional error, there is no need for a harmless-error review. *Id.,* 514 U.S. at 419, 115 S.Ct. at 1555, 131 L.Ed.2d at 507. Finally, materiality

of the evidence is to be considered cumulatively, "not item-by-item." *Id.*

9. The undisclosed documents which allegedly contain *Brady/Giglio* material are the documents which are attached to Patrick's post-verdict motions as exhibits 7, 9, 18, 20, 22, and 27. Patrick's civil attorney, Liebman, also had possession of defendant's exhibits 7, 9 and 27. (Def.'s Post-Verdict Mots. Exs. 7, 9, 27). Exhibits 18, 20 and 22 were in the sole possession of the government, and came from Nugent's file in this case.

would turn *Brady* on its head. As stated above, the government is required to turn over *Brady* documents even in the absence of a request from the defendant. In order to prevent defendants from generating frivolous *Brady* arguments on appeal, the circuits have tempered the general *Brady* rule by holding that defendants cannot successfully maintain *Brady* arguments where they could have obtained the exculpatory or impeachment evidence through the exercise of reasonable diligence. However, this rule only holds true when the defendant has the essential facts that would allow him to take advantage of the impeachment material; and as stated above, Patrick did not have the essential facts to take advantage of this impeachment material, and it is immaterial to this analysis that the government generally referred to these documents in its motion and that it had them in the courtroom on the day of the trial.

■ The government simply cannot satisfy its *Brady* obligations by bringing potential *Brady* documents along with it into the courtroom on the day the trial is to begin. Such a practice, in many cases, would be highly prejudicial to the defendant and would deprive the defendant of a fair trial because the defendant would then be forced to simultaneously try his case and review documents to determine whether these documents would be helpful to his defense, placing this burden on the defendant at the last minute would surely prejudice the defendant because it would require him to direct some of his attention away from the actual trial.

In this case, although the government brought the undisclosed documents to the conflict hearing, they never informed defendant as to the specific content of these documents.[10] The government now claims that Patrick cannot successfully advance a *Brady* argument because these materials were readily available to defendant. This argument, however, simply misses the mark. Patrick would only be precluded from assert-

ing a successful *Brady* claim if he had knowledge of the essential facts that would have permitted him to take advantage of the alleged impeachment material. The fact that the undisclosed documents were in the courtroom on the day of the trial does not mean that Patrick had the essential facts that would have allowed him to take advantage of the impeachment material in those documents. Indeed, Patrick did not have any of the facts that would have allowed him to take advantage of this alleged impeachment material. Thus, the Court cannot conclude that Patrick could have obtained these documents through the exercise of reasonable diligence.

Patrick, however, can not assert a successful *Brady* claim by merely demonstrating that the government failed to disclose certain information. Instead, as stated *supra*, Patrick must establish that the undisclosed documents were material in order to establish a *Brady* error, *i.e.*, Patrick must show that there is a reasonable probability that the outcome of his trial would have been different if he had use of the undisclosed documents.

In this regard, the Court finds that the undisclosed documents are material because there exists a reasonable probability that, had these documents been disclosed to Patrick, the result of his trial would have been different. After collectively reviewing the undisclosed documents in light of the entire trial record, the Court concludes that there is a reasonable probability that the outcome of the trial would have been different because these documents would have provided the defendant with information that could have been used to impeach one of the main prosecution witnesses. The existence of these documents thus undermines the confidence in the outcome of the trial.

As an initial matter, the government argues that these documents do not undermine

---

**10.** The Court does recognize that the prosecutor determines in the first instance whether evidence in its possession is *Brady/Giglio* material. Thus, the government's failure to physically supply these documents to a defendant because it may have decided that the documents were not covered by *Brady* is not error in and of itself. How-

ever, the government's failure to disclose the documents can be considered error if the court, upon specific objections, determines that these documents contain *Brady* material because it is clearly within the province of the trial court to make the final determination as to whether suppressed evidence contains *Brady* material.

the result of Patrick's trial because Mood was not a material witness to Patrick's guilt or innocence. The government argues that its primary witness against defendant was not Mood, but Deo, and that it was Deo who provided the only evidence linking Patrick to the death of Oblige and the scheme to defraud the insurance company. In contrast, the government argues that Mood's testimony was limited in scope and provided no evidentiary link between Deo and Patrick. The government asserts that Mood testified solely to the veterinary treatment she provided to Oblige, at Deo's request, prior to the onset of the horse's fatal infection. From these antecedent premises, the government concludes that even if the undisclosed documents could have been used to impeach, the outcome of the trial is not undermined because Mood's credibility was peripheral to the question of defendant's guilt or innocence. The Court, however, rejects this argument.

Instead of finding that Mood's testimony was not critical in the sense that it provided a direct evidentiary link between Deo and Patrick, the Court finds that Mood's credibility was critically important in establishing the government's entire theory of the case. In the indictment, and at trial through its case-in-chief and by way of opening and closing statements, the government argued that Patrick's motive for conspiring with Deo to kill Oblige was to "frame" Mood for the horse's death. According to the indictment, Patrick allegedly informed Deo that Deo should file a malpractice suit against Mood for Oblige's death. The filing of the suit would achieve two purposes: first, Deo could claim medical malpractice as the cause of Oblige's death; and second, Mood's reputation as a veterinarian would be damaged. The damage to Mood's career was allegedly important to Patrick because Mood was a competitor of Patrick in the veterinarian field. In sum, the motive for Patrick's involvement in the conspiracy with Deo was his desire to "frame" Mood and eliminate her as a competitor.

Because Patrick's alleged desire to ruin Mood's career was the motive for Patrick

conspiring with Deo to kill Oblige, the credibility of Mood was critically important to the success of the government's case against Patrick. Indeed, if the jury found Mood not to be a credible witness, the jury may have been less likely to believe that Patrick intended to "frame" Mood for the death of Oblige. Thus, despite the government's arguments to the contrary, the Court, in light of the entire trial record and the indictment, cannot find that Mood's testimony was peripheral to establishing Patrick's guilt or innocence. Because the testimony of Mood was critical in establishing the government's case against Patrick, the Court must now consider whether the outcome of Patrick's trial could have been different if the government disclosed the documents in question. See Perdomo, 929 F.2d at 972.

In this regard, the Court finds that the undisclosed documents, if they had been disclosed and used effectively by Patrick's trial counsel, could have made the difference between a conviction and acquittal for Patrick. This decision is perforce required because the undisclosed documents provide defendant with information that could have been effectively used to impeach Mood's credibility, which could have tipped the scales in favor of defendant in light of the record of this case. Indeed, the evidence in this case against Patrick was anything but overwhelming. To begin, the only direct evidence linking Patrick to the conspiracy was the testimony of Deo, who admitted to being a habitual liar, pled guilty to fraud charges and testified only in exchange for leniency in his sentencing. There was no physical evidence or eyewitness testimony concerning Patrick in the death of Oblige. The telephone records provided by the government were only marginally relevant to any count. Finally, nowhere in the tape recorded conversation between Deo and Patrick did Patrick ever admit that he was involved in the conspiracy to kill Oblige. Because the question of defendant's guilt was extremely close, the Court concludes that the impeachment value of the undisclosed docu-

ments could have made the difference between conviction and acquittal for Patrick.

The undisclosed documents that defendant refers to have significant impeachment value. For example, Exhibit 7 is a letter from Nugent to Liebman advising that the tires to Mood's vehicle were suspiciously being flattened. Exhibit 9 was a letter from Nugent to Liebman wherein Nugent states that he was "look[ing] forward to cross-examining Dr. Patrick." With this statement, defendant could have argued, through this cross-examination of the Mood, that Nugent was referring to his prior threats to reveal alleged illegal conduct to the racing commission. Defense counsel could have used these documents at trial on cross-examination to demonstrate the deep felt hostility between Mood and Patrick in the course of the civil suit. This cross-examination would have put into question Mood's testimony that she did not testify with the hope that Patrick would be convicted and removed as a competitor from the race track.

The Court also finds that exhibits 20, 22 and 27 contain significant impeachment value. At trial, Mood testified that she did not give any part of her testimony "in the hope that Dr. Patrick would be convicted and removed as one of her competitors for clients at the race track." (T. 2/24/97 at 63).[11] Mood also testified that when her employment with Patrick was terminated that she walked around the race track merely to say good-bye to the trainers she had worked with and that she did not make these rounds with the intent of being employed by any of Patrick's clients. (T. 2/24/97 at 51). The inference being that there was no attempt by her to solicit Patrick's clients, and that it would not affect her financially if Patrick remained an active veterinarian at the race track.

Exhibits 20, 22 and 27 could have been used to directly impeach Mood's testimony with respect to these areas. To begin, exhibit 27 documents the financial hardship that the restrictive covenant had placed on Mood and demonstrates Mood's refusal to stop working for and soliciting Patrick's clients. Exhibit 20 indicates that Mood would be able to continue to passively solicit Patrick's clients. Exhibit 22 expressly demonstrates that Mood was concerned about her ability to actively solicit Patrick's clients in that active solicitation is how a veterinarian makes a living. Exhibit 22 also advises Mood, in an attempt to address Mood's concerns with respect to active solicitation, that Mood could still work for any of Patrick's clients as long as she did not attempt to steal them. It is clear that Patrick could have used these exhibits to impeach Mood by demonstrating that Mood's firing by Patrick placed her under a financial hardship. In addition, these documents could have been used to impeach Mood's testimony that she did not give any of her testimony in the hope that Patrick was removed as a competitor from the track or that she did not attempt to steal Patrick's clients. In sum, these documents provided Patrick with valuable impeachment material.

Finally, the Court finds that Patrick could have effectively used exhibit 18 to impeach Mood at trial. Exhibit 18 is a letter of June 22, 1990 from Nugent to Mood in which Nugent inquires about the identity of a veterinarian's involvement with steroid distribution in light of a news article on the subject. Although the government argues that this letter is consistent with Mood's trial testimony, the Court finds to the contrary. At trial, Mood testified that she learned of Patrick's alleged involvement with the sale of steroids from Patrick's assistant. However, Patrick was able to effectively refute Mood's testimony by calling Patrick's assistant who testified that he never told Mood that Patrick was involved in the sale of steroids. Based on this testimony, the government argues that exhibit 18 does not provide any additional impeachment material in light of the assistant's testimony. Despite the assistant's testimony, the Court finds that exhibit 18 does provide information that could have been used to impeach Mood.

---

11. "T." refers to the transcript of the trial. The date in the parentheses refer to actual date on which the testimony was received into evidence. The final number in the parentheses refers to the page number of the transcript.

If Patrick had use of the letter of June 22, 1990, he could have used it to demonstrate that Mood may not have first learned of Patrick's involvement with steroids from Patrick's assistant. Not only would the jury then have had before it the assistant's testimony, it would have also had evidence that Mood's attorney might have planted the first seed of Patrick's steroid involvement in Mood's head. This evidence would have supported defendant's contention that Mood had ulterior motives in testifying against Patrick and that Mood's animosity against Patrick had manifested itself in different ways, including an attempt by Mood to implicate Patrick in a criminal scheme to distribute steroids. Thus, the Court finds that exhibit 18 could have also been used to impeach the testimony of Mood.

In sum, the Court finds that Patrick has established a *Brady* error that requires a new trial because there exists a reasonable probability that the outcome of Patrick's trial would have been different if he had the use of the documents that the government failed to disclose. As stated above, Patrick's conviction was supported by anything but overwhelming evidence. When it is considered that the government failed to disclose documents that provided valuable impeachment material to defendant of a critical prosecution witness, confidence in the outcome of Patrick's trial is severely undermined. Thus, in the interests of justice and in order to protect Patrick's right to a fair trial, the Court must order a new trial based on a violation of *Brady* and its progeny.

### V. Conclusion

Accordingly, for the foregoing reasons, the Court will deny defendant's motion for judgment of acquittal, and in the alternative, motion for arrest of judgment. The Court, however, will grant defendant's motion for a new trial.